# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Ramos v. Kewanee Hospital*, 2013 IL App (3d) 120001

---

| | |
|---|---|
| Appellate Court Caption | JULIO RAMOS, M.D., Plaintiff-Appellant, v. KEWANEE HOSPITAL, Defendant-Appellee. |
| District & No. | Third District<br>Docket No. 3-12-0001 |
| Filed<br>Rehearing denied | May 31, 2013<br>August 13, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action alleging that plaintiff physician's hospital privileges were improperly suspended, plaintiff was not entitled to judgment *n.o.v.*, since the evidence of the prejudice suffered by plaintiff was not so overwhelming that the verdict for defendant hospital could not stand; however, plaintiff was entitled to a new trial based on the trial court's error in prohibiting plaintiff from deposing employees of the entity defendant retained to review the patient care incidents involving plaintiff, and the award of costs and expenses to defendant based on plaintiff's voluntarily dismissed first complaint was reversed on the ground that those sanctions were imposed after plaintiff refiled his action. |
| Decision Under Review | Appeal from the Circuit Court of Henry County, No. 11-L-14; the Hon. Charles H. Stengel, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part, and reversed; cause remanded. |

Counsel on
Appeal

Thomas J. Pliura (argued), of LeRoy, for appellant.

Fatema F. Zanzi and Douglas B. Swill, both of Drinker Biddle & Reath LLP, of Chicago, and John J. D'Attomo (argued), of Carlson Partners, Ltd., of Lombard, for appellee.

Panel

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.

Justices Carter and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1      Plaintiff, Julio Ramos, M.D., filed a three-count second amended complaint against defendant, Kewanee Hospital (the hospital), seeking injunctive relief, a declaration that the hospital improperly summarily suspended his privileges, and damages arising from the summary suspension. Plaintiff voluntarily dismissed his second amended complaint, then filed the current action six weeks later. Following trial, a jury returned a verdict in favor of the defendant hospital. Plaintiff appeals, claiming, *inter alia*, he was improperly assessed fees and costs in the refiled case that were associated with the original action, the trial court erred in denying his motion for substitution of judge, the trial court made numerous erroneous evidentiary rulings, and he is entitled to a judgment notwithstanding the verdict. We affirm in part, vacate in part, reverse in part, and remand for further proceedings.

¶ 2                          BACKGROUND

¶ 3      Dr. Ramos is a family practice physician. He worked from August of 2002 through November of 2007 as an employee of the defendant hospital. In November 2007, he sought to terminate his employment with the hospital. On November 30, 2007, he entered into an agreement with Regional Family Health Center, S.C. (Regional Family), to provide physician services for it. Dr. Remi Satkauskas and Dr. Kevin Jeffries own Regional Family. By December of 2007, Dr. Ramos also began working full-time as an emergency room physician at Graham Hospital in Canton, Illinois. During these times, he maintained clinical privileges at Kewanee Hospital.

¶ 4      The defendant hospital has adopted medical staff bylaws that set forth procedures by which a physician can apply for clinical privileges, as well as a process by which those privileges may be suspended or revoked. The process includes review by the medical executive committee (MEC). The MEC is a committee of active members of the hospital medical staff with responsibility for various staff activities. The MEC advises the board concerning a physician's qualifications and the propriety of maintaining privileges. The

-2-

board, however, maintains the final and ultimate decision making authority regarding whether to grant, revoke, or suspend a physician's clinical privileges.

¶ 5    The bylaws' conflict of interest provision prohibits a member of any hospital committee from participating in the discussion or voting on a matter in which the member "has or reasonably could be perceived to have a conflict of interest or to be biased in any matter involving another medical staff member." The bylaws further provide that the chief executive officer (CEO), the board, or any active member of the medical staff may initiate a request for investigation or corrective action against a physician with clinical privileges.

¶ 6    On or about June 3, 2008, the hospital received a report from HealthSystems of Illinois (HSI report) concerning patient care involving Ramos. HealthSystems is an independent quality review organization contracted by the Illinois Department of Healthcare and Family Services to perform review of inpatient services provided to Medicaid program participants. The hospital did not solicit the HSI report and had never previously received an HSI report.

¶ 7    Prior to June of 2008, the CEO of the hospital, Gustafson, was aware of two other patient care incidents involving Ramos, which were under review by the hospital's peer review committee. After receiving the HSI report, the hospital board issued a written request to the hospital's MEC to review the three patient care incidents and initiate corrective action if warranted.

¶ 8    The MEC sent a letter to Ramos on July 11, 2008, informing him of the three patient care incidents and advising him that a special meeting of the MEC was scheduled for July 17, 2008. The letter requested he attend the meeting, which he did. At the meeting, he responded to questions regarding the incidents, submitted written materials to the MEC, presented his version of the events surrounding the incidents and acknowledged that he reviewed the medical records of all three patients prior to the meeting.

¶ 9    On July 17, 2008, the board received a fourth patient care incident involving Ramos and referred this incident to the MEC as well. The MEC declined to consider the fourth incident until it completed the review of the previous three.

¶ 10    The MEC declined to appoint an *ad hoc* committee to investigate the three patient care incidents. The MEC issued a "Letter of Concern" to Ramos and felt no other action was warranted. Dr. Satkauskas and Dr. Jeffries were members of the MEC at the time it issued the letter of concern.

¶ 11    The board claims that prior to June of 2008, it engaged a peer review consultant to provide peer review education to the MEC as the board felt there were serious deficiencies in its review process. One recommendation made by this consultant was for the hospital to refer cases to an external entity for peer reviews. In July of 2008, the board decided to send the four patient care incidents involving Dr. Ramos to CIMRO Quality Healthcare Solutions (CIMRO).

¶ 12    CIMRO prepared a report that was presented to the board. Thereafter, on August 1, 2008, the hospital directed Dr. Satkauskas to ask Dr. Ramos if he would voluntarily refrain from practicing or taking calls at the hospital pending further review of the four patient care incidents. Ramos rejected the request.

¶ 13    The board then met on August 5, 2008, where the CIMRO physician reviewer gave an

oral presentation concerning her findings and recommendations. Two days later, the board provided Ramos with written notice that his clinical privileges were summarily suspended pending further investigation. The bylaws of the hospital state that in such instances the physician is entitled to a hearing within 15 business days, commonly referred to as a "fair hearing."

¶ 14     On August 15, 2008, Ramos requested a fair hearing pursuant to the bylaws. Ramos, the medical staff and Gustafson agreed on a hearing officer who presided over the hearing. Nineteen hours of testimony and argument were presented at the hearing. The initial session of the fair hearing did not commence until August 27, 2008, which the hospital admits is 3 days beyond the 15-day period. The hospital attributes this three-day delay to difficulties in coordinating the schedules of the hearing officer and physicians on the fair hearing committee.

¶ 15     On October 14, 2008, the fair hearing committee issued a report and recommendation. The board, pursuant to the report, decided to reinstate Ramos's clinical privileges subject to certain monitoring and supervision requirements. The board notified Ramos of this decision on October 30, 2008. He rejected the proposal the next day and demanded an appellate hearing before the board.

¶ 16     On November 25, 2008, the board conducted the appellate hearing. Thereafter, on December 1, 2008, the board asked Ramos to inform it in 10 days how and why the proposed monitoring plan was unacceptable. Ramos made no response. On December 12, 2008, the board provided Ramos with notice of final action, that being continuing the summary suspension.

¶ 17     While the administrative proceedings detailed above were pending, on August 26, 2008, Ramos filed a two-count complaint seeking injunctive relieve and a declaration that his clinical privileges were improperly suspended. In April of 2009, the trial court conducted a five-day hearing on the preliminary injunction, ultimately denying plaintiff's request for the injunction.

¶ 18     On July 24, 2009, Ramos filed an amended complaint adding a count seeking damages. The trial court dismissed that count, without prejudice, after which plaintiff filed a second amended complaint.

¶ 19     Defendant filed a counterclaim alleging that article VI, section 2(a), of the bylaws is void and unenforceable under Illinois law as that section purports to require the consent of the medical staff before the hospital may summarily suspend a physician's clinical privileges. This section clearly states that the CEO and chief of staff must act jointly when issuing a summary suspension of a physician's privileges. The trial court held this language violated the court's pronouncement in *Lo v. Provena Covenant Medical Center*, 342 Ill. App. 3d 975 (2003), which stated that bylaws requiring a hospital to obtain the staff's approval prior to disciplining the staff violate public policy. As such, the trial court found article VI, section 2(a)'s requirement to that effect unenforceable as against Illinois public policy.

¶ 20     The trial court also, in August of 2010, set a trial date of January 10, 2011. In October of 2010, the trial court struck plaintiff's jury demand as untimely. Plaintiff filed another jury demand, which was also struck by the court. On January 4, 2011, the parties appeared for a

final pretrial at which time the plaintiff announced his intention to exercise his right to a voluntary dismissal. The trial court entered an order on January 6, 2011, dismissing plaintiff's original case, No. O8-CH-123, without prejudice. Plaintiff paid defendant $136 in costs associated with the filing of defendant's answer in case No. 08-CH-123.

¶ 21 The plaintiff filed case No. 11-L-4 on February 16, 2011. Case No. 11-L-4 asserts two counts. Count I is for declaratory relief seeking a declaration that Ramos's summary suspension is contrary to the bylaws of the hospital and void *ab initio*. Count II is a breach of contract count in which Ramos seeks money damages. Both of these counts were pled in case No. 08-CH-123. On February 28, 2011, plaintiff filed a motion for substitution of judge as a matter of right. On March 19, 2011, in case No. 11-L-4, defendant moved pursuant to Illinois Supreme Court Rule 219(e) (eff. Nov. 27, 2002) for costs associated with case No. 08-CH-123. Eventually, the trial court denied plaintiff's motion for substitution of judge and awarded defendant $22,649.03 in costs and expenses associated with the defense of case No. 08-CH-123.

¶ 22 Despite repeated requests at the administrative level and during the discovery phase at the trial level, the hospital failed to disclose to the plaintiff the original copy of CIMRO's report until August 17, 2011, which was approximately one month prior to trial. When reviewing the original version CIMRO sent to Christine Bermudez, the hospital's quality control director, and the version that was ultimately given to the MEC, the plaintiff determined the following language was added to the conclusion of the second version:

"The PR (physician reviewer), as a board certified family physician, upon review of the four episodes of care provided by the physician, under review in multiple settings, provided the following recommendations:

* Refer for formal assessment of potential impairment; physical, emotional, mental, and substance-related.

* Refer to the governing board of the hospital due to the potential imminent threat to patient safety."

¶ 23 Upon learning of the existence of the original report which omitted this language, plaintiff issued subpoenas for depositions of Diane Homan, M.D., and Judy Ring, RN, BSN of CIMRO. The subpoenas also sought to obtain documents associated with CIMRO's review of Dr. Ramos's activities. Homan and Ring filed a motion to quash the subpoenas. The trial court granted the motion, thereby prohibiting plaintiff from deposing anyone from CIMRO.

¶ 24 Case No. 11-L-4 proceeded to a six-day trial in September of 2011. As neither party felt it necessary to recap the trial testimony in their briefs to this court, that which is relevant to our analysis will be detailed below. Ultimately, the jury returned a verdict in favor of the hospital. Plaintiff filed a posttrial motion seeking, *inter alia*, a judgment notwithstanding the verdict (judgment *n.o.v.*). The trial court denied plaintiff's motion. The trial court also stayed enforcement of its order awarding defendant $22,649.03 in costs and expenses related to case No. 08-CH-123. This timely appeal followed.

¶ 26    Plaintiff raises numerous issues on appeal. The vast majority of these arguments can be separated into two categories: arguments claiming plaintiff is entitled to a judgment *n.o.v.*, and arguments claiming plaintiff is entitled to a new trial. Plaintiff also claims the trial court erred in entering a judgment against him in this case, No. 11-L-4, for $22,649.03 in costs and expenses associated with case No. 08-CH-123.

¶ 27                                    I. Judgment *N.O.V.*

¶ 28    Plaintiff claims the trial court improperly denied his motion for a judgment *n.o.v.* Specifically, plaintiff identifies a number of provisions of the hospital's bylaws and claims he unequivocally proved violations of these provisions. Proving a violation of any one of these bylaws, plaintiff submits, entitled him to a verdict in his favor. Therefore, plaintiff argues he is entitled to a judgment *n.o.v.*

¶ 29    We review *de novo* a trial court's denial of a motion for judgment *n.o.v. Serrano v. Rotman*, 406 Ill. App. 3d 900, 908 (2011). A judgment *n.o.v.* is properly entered only where the evidence, when viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967); *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). In ruling on a motion for judgment *n.o.v.*, the trial court does not weigh the evidence, nor is it concerned with the credibility of witnesses. *Id.* A judgment *n.o.v.* is improper where there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where witness credibility or a resolution of conflicting evidence is decisive of the outcome. *Id.* at 454.

¶ 30    Again, plaintiff adduced evidence at trial and argued to the jury that he proved the hospital violated its own bylaws when issuing his summary suspension. To fully analyze his theories of why he is entitled to a judgment *n.o.v.*, we must first discuss the applicable burden of proof employed at the trial court level when a physician claims his hospital privileges were improperly suspended or terminated.

¶ 31    Illinois subscribes to the rule of nonreview when it comes to cases involving private hospital staff privileges. *Adkins v. Sarah Bush Lincoln Health Center*, 129 Ill. 2d 497 (1989). As a matter of Illinois public policy, staffing decisions of private hospitals are only subject to judicial review when the decision involves a revocation or reduction of existing staff privileges. *Id.* at 506. In such instances, the hospital's action is subject to limited judicial review to determine whether the decision made was in compliance with the hospital's bylaws. *Id.* at 506-07. The judicial reluctance to review these internal staff decisions reflects the unwillingness of courts to substitute our judgment for the professional judgment of hospital officials with superior qualifications to consider and decide such issues. *Id.* at 507. A court may reverse the decision of the hospital officials if it is not in accordance with the bylaws or if the bylaws were followed but "actual unfairness on the part of the hospital, its committees or individual members of the committees is demonstrated in the record." *Id.* at 514. A hospital need not employ "perfect" compliance with its bylaws as substantial compliance will suffice. *Chessick v. Sherman Hospital Ass'n*, 190 Ill. App. 3d 889, 899

(1989); *Carson v. Northwest Community Hospital*, 192 Ill. App. 3d 118, 121 (1989).

¶ 32 Plaintiff identifies specific sections of the bylaws, which we will discuss individually below, and claims that he unequivocally proved the hospital violated these sections. Defendant asserts the plaintiff failed to adduce overwhelming evidence of a material breach of the bylaws. Therefore, defendant concludes that the trial court properly denied plaintiff's motion for a judgment *n.o.v.* as plaintiff failed to meet the *Pedrick* standard.

¶ 33                                   A. Article IV, Section 2(a)

¶ 34 Ramos begins his argument identifying article IV, section 2(a), which states that the "Chief of Staff, or designee, and the Chief Executive Officer, or designee, shall jointly have the authority, whenever action must be taken immediately to prevent imminent danger to the health of any person, to summarily suspend all or any portion of the Clinical Privileges of a Physician ***."

¶ 35 Plaintiff claims it is uncontrovered that the MEC and chief of staff did not agree to the summary suspension. Therefore, plaintiff posits that he unequivocally proved a violation of article VI, section 2(a), of the hospital bylaws entitling him to a judgment *n.o.v.* Plaintiff directs our attention to language in this section stating the chief of staff and the CEO "shall jointly" have the authority to summarily suspend a physician.

¶ 36 Nowhere, however, does the plaintiff even mention that the trial court found that the language in article VI, section 2(a), violates public policy of Illinois as announced in *Lo v. Provena Covenant Medical Center*, 342 Ill. App. 3d 975. The *Lo* court noted that if "the medical staff had the power to veto any restrictions the hospital would impose on a physician's defective practice–if the hospital could stop substandard treatment only upon the medical staff's recommendation or approval–the medical staff would effectively not be 'accountable' to the hospital for the quality of care, and the hospital could not 'require' the medical staff to do anything to eliminate an imminent danger to patients." *Id.* at 984. Such a policy, the *Lo* court found, would violate numerous "requirements of state and federal law" which mandate that a hospital has an effective governing body legally responsible for the conduct of the hospital as an institution. *Id.* at 983.

¶ 37 Again, nowhere in plaintiff's argument to this court do we find that he challenges the trial court's ruling that article IV, section 2(a), violates public policy and is therefore unenforceable. Plaintiff merely states that he unequivocally proved the CEO of the hospital acted unilaterally in violation of article IV, section 2(a). To determine whether plaintiff is indeed entitled to a judgment *n.o.v.* for unequivocally proving a violation of article IV, section 2(a), we would first need to determine whether the trial court properly interpreted *Lo* and whether or not that section of the bylaws is, in fact, enforceable. However, plaintiff has chosen not to address the trial court's ruling on the issue. Therefore, we find plaintiff's argument regarding article IV, section 2(a), to be forfeited. The appellate court is not a repository into which an appellant may foist the burden of argument and research. *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010). "Points not argued are waived" and failure to properly develop an argument and support it with citation to relevant authority results in forfeiture of that argument. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008).

¶ 38                                    B. Article VI, Section 1(g)

¶ 39        Plaintiff's next theory as to why he is entitled to a judgment *n.o.v.* involves article VI, section 1(g). Plaintiff claims this section mandates that once the MEC decides no further action is warranted, the hospital can take no further action. Plaintiff argues that the MEC found no action was warranted and, therefore, the summary suspension violated this section. The hospital counters, arguing that the clear language of article VI, section 1(g), indicates that only the MEC can take no further action if its findings are favorable to the physician.

¶ 40        Article VI, section 1(g), states:

> "The Chief Executive Officer shall promptly notify the Physician or Practitioner in writing of the action taken by the Executive Committee. If the action is favorable to the Physician or Practitioner so notified, no further action is taken. If the recommendation of the Executive Committee is adverse, the Chief Executive Officer shall notify the Physician or Practitioner by certified mail, return receipt requested, advising the Physician or Practitioner of the adverse recommendation and the reasons for the adverse recommendation (including all reasons based on the quality of medical care or other basis, including economic factors), and the hearing procedure to be followed according to Article VII of these Bylaws."

¶ 41        The record reveals that following the MEC's meeting of July 17, 2008, the MEC issued a "letter of concern" to Ramos regarding "issues of professionalism." The MEC's letter, dated August 1, 2008, indicates that "the MEC felt that there were issues of concern relating to clinical care delivered" for the first case reviewed. The letter further identifies a "separate concern related to the interaction between [Ramos] and the Radiology Technician" on the second case reviewed. For the third case, the "MEC was unable to determine whether [Ramos's] conduct was appropriate or not" given "the varying accounts of what happened." While the MEC did "not feel action in addition to" its August 1, 2008, letter was necessary, it did wish "to express serious concern about the above allegations."

¶ 42        Plaintiff argued to the jury that article VI, section 1(g), prohibited any further action from being taken against him once the MEC decided no further action was warranted. The bylaws clearly state, however, that is true only when "the action [taken by the MEC] is favorable to the physician." As noted above, to be entitled to a judgment *n.o.v.*, Ramos must show when all the evidence, viewed in the light most favorable to the hospital, so overwhelmingly favors him that no contrary verdict can stand. *Pedrick*, 37 Ill. 2d at 510. Ramos has not met this burden. The jury could have reasonably concluded that the letter issued by the MEC which "expresses serious concerns" about the three incidents reviewed does not equate to an action "favorable to the physician."


¶ 43                                    C. Article VI, Sections 2(b) and 2(c)

¶ 44        Plaintiff also notes that the hospital failed to provide him a fair hearing within 5 days of his request and 15 days of the issuance of the suspension as required by article VI, section 2(c), and article VI, section 2(b), respectively. The record demonstrates, and the hospital concedes, that the hearing took place three days beyond that time frame. Plaintiff makes no

argument and provides no citation to authority indicating how this prejudiced him in any way. Nor does the plaintiff provide argument or authority for a claim that this three-day delay equated to a material breach of the bylaws.

¶ 45 As noted above, when a physician proves that a hospital violated its bylaws in suspending or revoking the physician's privileges, "the violations must be substantial to require judicial intervention." *Chessick*, 190 Ill. App. 3d at 899. That is, to be entitled to relief, the plaintiff must show "the violations prejudice the plaintiff." *Id.*

¶ 46 At the commencement of the fair hearing, albeit 3 days late, 19 hours of testimony and argument were presented. There is no allegation that the three-day delay somehow prevented plaintiff from putting forth evidence he wished to present at the hearing. We acknowledge that the plaintiff proved the hearing began three days beyond the term called for in article VI, sections 2(b) and 2(c), of the bylaws. However, plaintiff having failed to prove or even allege that this somehow prejudiced him in any way, we hold the plaintiff is not entitled to a judgment *n.o.v.* on this issue.

¶ 47                                    D. Article VII, Section 2(d)

¶ 48 Plaintiff also claims that defendant failed to provide him with proper written notice of hearing in violation of article VII, section 2(d), of the bylaws. Specifically, plaintiff contends he did not receive written notice which stated in concise language the acts or omissions with which he was charged. Plaintiff fails, however, to explain how this lack of proper notice prejudiced him.

¶ 49 Article VII, section 2(d), states:

"The Chief Executive Officer shall provide the Physician or Practitioner with a written notice of the time, place and date of the hearing. The notice of such hearing shall state in concise language the acts or omissions with which the Physician or Practitioner is charged, or the other reasons for the adverse recommendation or decision, including all reasons based on the quality of medical care or any other basis, including economic factors. The notice shall also state that the Physician or Practitioner has the right to inspect all pertinent information in the hospital's possession with respect to the recommendation, upon written request and at reasonable times."

¶ 50 The record reveals that plaintiff received a letter dated July 11, 2008, which sets forth the facts and circumstances underlying the three patient cases under review by the MEC. Defendant claims the July 11, 2008, letter was sufficient notice to comply with the aforementioned bylaw provision as it put Ramos on notice of the claims against him and he actively participated in the MEC proceedings.

¶ 51 The record further indicates that the hospital had a formal notice hand-delivered on August 25, 2008, a mere two days before the hearing. Plaintiff argues this notice was also insufficient, but he offers no explanation as to why it was insufficient beyond claiming "it speaks for itself."

¶ 52 Again, the record indicates plaintiff actively participated and was represented by counsel during the fair hearing. Plaintiff does not argue that issues were discussed during the hearing

of which he had no notice nor which surprised him. We find no evidence in the record that the plaintiff asked for additional time to respond to the issues identified in the hospital's August 25, 2008, notice or the July 11, 2008, letter. We cannot say that the evidence of noncompliance so overwhelmingly favors plaintiff that no contrary verdict can stand. As such, we hold Ramos is not entitled to a judgment *n.o.v.* on this issue.

¶ 53                              E. Article VII, Section 3(d)(i)

¶ 54    Plaintiff claims to have unequivocally proved a violation of article VII, section 3(d)(i), which states:

> "The proceeding before the Board shall be in the nature of an appellate hearing based on the record of the hearing before the hearing committee and any appeal statements submitted. Each party shall have the right to make oral argument personally or through his/her representative, subject to limits or rules adopted by the Board, and the Board may, in its sole discretion, ask questions of the parties. The Board may thereafter conduct, at a time convenient to itself, deliberations outside the presence of the appellant and respondent and their representatives for the purpose of determining whether the adverse recommendation or decision against the affected Physician or Practitioner was justified and was not unreasonable, arbitrary or capricious."

¶ 55    Plaintiff asserts this section prohibited Mark Rewerts from attending the deliberations on appellate review after Rewerts acted as the board's representative in the fair hearing. Defendant acknowledges Rewerts' presence at the appellate deliberations, but claims it offered uncontroverted evidence that Rewerts abstained from voting on the matter of Ramos's privileges. As with other issues discussed above, the fact that the jury returned a verdict in favor of the hospital indicates that it found Rewerts' presence at the appellate hearing did not constitute a material breach of this section of the bylaws.

¶ 56    We cannot say the evidence, when viewed in the light most favorable to the hospital, so overwhelmingly favors the plaintiff that no contrary verdict could ever stand. We must note that we find no language in article VII, section 3(d)(i), prohibiting a board member who represented the board at the fair hearing from attending the appellate proceeding. Plaintiff fails to develop his argument identifying the exact language contained in this section upon which his argument is based. Arguably, the language indicating that the proceeding before the board "shall be in the nature of an appellate proceeding" indicates that one acting as an advocate during the fair hearing cannot sit on the appellate tribunal charged with ruling on matters which took place at the fair hearing.

¶ 57    However, the hospital put forth evidence that Rewerts abstained from voting on issues presented to the board. This is certainly evidence from which the jury could have concluded that Rewerts merely attended the "appellate proceeding" and took no meaningful part therein. As we find no language in this bylaw prohibiting attendance at the appellate proceeding, we cannot say that Ramos is entitled to a judgment *n.o.v.* based upon his allegation that he unequivocally proved a violation of article VII, section 3(d)(i).

¶ 58                                    F. Article VII, Section 2(f)(vi)

¶ 59        Plaintiff further argues that it is undisputed that the hospital failed to provide plaintiff a copy of the original CIMRO report, in violation of article VII, section 2(f)(vi), of the bylaws. That section states that the physician or practitioner "shall have the right to inspect all information in the hospital's possession with respect to adverse action or recommendation." Withholding the original CIMRO report, plaintiff asserts, unequivocally violated this section of the bylaws.

¶ 60        The hospital acknowledges there were two versions of the CIMRO report, referring to one as a "draft" and the other as the "final CIMRO report." The hospital also does not dispute that it failed to provide Ramos with the original version of the CIMRO report.

¶ 61        Despite failing to turn over the original CIMRO report before the matter proceeded to the fair hearing, the hospital claims that even if this is a technical violation of the bylaws, the plaintiff has not shown how this prejudiced him or how it entitles him to a judgment *n.o.v.* The hospital notes that Gary Pheiffer, the chair of the board, testified that even without the added language in the final CIMRO report, he still would have voted in favor of a summary suspension. The hospital further notes that Ramos put on evidence from Christine Bermudez, the hospital's quality control director, and Margaret Gustafson, the hospital's CEO, which showed that language was indeed added to the CIMRO report and that the hospital failed to disclose the original report. While this evidence seems damning to the defendant, the hospital notes it indicates the jury was well aware of its failure to disclose the CIMRO report. The hospital continues that it was a question of fact for the jury to determine whether failure to turn over the report equated to a material breach of article VII, section 2(f)(vi), and, given the jury's verdict, a question it must have resolved in favor of the hospital.

¶ 62        The hospital's failure to disclose the original copy of the CIMRO report is certainly troublesome. However, given the standard of review employed when determining whether a party is entitled to a judgment *n.o.v.* which prohibits us from reweighing the evidence (*Maple*, 151 Ill. 2d at 453), we cannot say the trial court erred in denying plaintiff's motion for a judgment *n.o.v.* on this issue. Our concern is whether there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute. *Id.* We may only find the trial court erred in denying a motion for a judgment *n.o.v.* when the evidence so overwhelmingly favors the moving party that no contrary verdict based on the evidence could ever stand. *Pedrick*, 37 Ill. 2d at 510.

¶ 63        While the original version of the report did not contain the allegation that Ramos's actions posed an "imminent threat to patient safety" as does the final version, it did express a number of concerns; those concerns related to the treatment of three patients. The allegations contained within the original CIMRO report when coupled with Pheiffer's testimony that the additional language would not have changed his vote regarding plaintiff's summary suspension leave us unable to say that the evidence of prejudice to the plaintiff by the hospital's failure to timely disclose the original report is so overwhelming that no contrary verdict may stand. Therefore, we hold the trial court did not err in denying plaintiff's motion for a judgment *n.o.v.*

¶ 64                                    II. New Trial

¶ 65        Although we have found that plaintiff is not entitled to a judgment *n.o.v.*, we do,
however, hold plaintiff is entitled to a new trial. Plaintiff makes a number of arguments
regarding alleged errors made below, which he claims prevented him from receiving a fair
trial.

¶ 66                                  A. CIMRO Reports

¶ 67        Arguments concerning the CIMRO reports can be found in numerous sections of both
the plaintiff's and defendant's briefs to this court. The parties have interwoven these
arguments between claims of both error and propriety. Plaintiff argues that erroneous rulings
regarding the CIMRO reports were made both prior to trial and during the trial. The pretrial
errors, plaintiff claims, stem from the trial court prohibiting him from deposing employees
of CIMRO regarding the creation of differing versions of CIMRO's report. Plaintiff claims
that prohibiting him from deposing those employees denied his right to a fair trial as it
prohibited him from presenting his theory of the case; that is, the process below was unfair
as Gustafson manipulated the process out of personal animus against the plaintiff. Plaintiff
also argues that during trial the defendant was improperly allowed to present evidence
pertaining to the CIMRO report. For the reasons that follow, we find the trial court denied
plaintiff a fair trial when refusing to allow plaintiff the opportunity to depose those
associated with generating the CIMRO report. As such, we reverse the judgment entered
below and remand for further proceedings.

¶ 68        Explanation at how we arrive at this decision necessitates review of the circumstances
surrounding the creation of the CIMRO reports and one of the plaintiff's theories of why his
privileges were wrongfully suspended. In addition to claiming the hospital violated its bylaws
as we detail above, plaintiff proceeded under the theory that the hospital engaged in "actual
unfairness" when suspending him. He noted, and the hospital does not dispute, that article
VI, section 2(a), only allows for a summary suspension "whenever action must be taken
immediately to prevent imminent danger to the health of any person." He further notes, and
the hospital does not dispute, that no one on the MEC or any other physician associated with
the hospital opined that suspension was necessary to prevent imminent danger to the health
of any person.

¶ 69        During the administrative proceedings below and throughout the course of the litigation,
Ramos repeatedly requested all documents possessed by the hospital which were relevant to
his suspension. Despite these numerous requests initially made as early as August 15, 2008,
the hospital did not produce the original version of the CIMRO report until August 17, 2011,
approximately one month prior to the September 19, 2011, trial.

¶ 70        The original report contains no specific allegation or observation that suspension was
necessary to prevent imminent danger to the health of any person. The subsequent version
of the report and the only one shown to the hospital board added language recommending
sanctions "due to the potential imminent threat to patient safety." The trial court prohibited
Ramos from deposing those from CIMRO who were responsible for crafting the two
different versions of the report and fully exploring the circumstances surrounding each

version.

¶ 71 Plaintiff makes numerous arguments as to why prohibiting him from deposing those from CIMRO amounts to reversible error. The defendant posits that the trial court correctly barred Ramos from deposing the CIMRO employees as "allowing discovery concerning the findings and conclusions of the CIMRO physician reviewer would open the door to the relitigation of the physician's clinical competence or professional conduct." We disagree.

¶ 72 We acknowledge, as defendant indicates, that the rule of nonreview precludes courts from reviewing a hospital's determination of a physician's clinical competence as the rule is founded on the premise that courts should not "substitute their judgment for the professional judgment of hospital officials with superior qualifications to consider and decide such issues." *Adkins*, 129 Ill. 2d at 507. The *Adkins* court did not end its explanation of the rule with that pronouncement. It noted that a "court, however, will be justified in reviewing a private hospital's actions even where the bylaws are followed if actual unfairness on the part of the hospital, its committees or individual members of the committees is demonstrated in the record." *Id.* at 514.

¶ 73 While the rule of nonreview precludes us, as it did the trial court, from analyzing whether in fact Dr. Ramos posed an imminent danger to patient health, it does not *ipso facto* make the CIMRO reports irrelevant to Ramos's claim of fundamental and actual unfairness merely due to the fact that the reports comment on his competence. Ramos propounded a theory below that Gustafson was "out to get him" as he would not support her attempts to change certain bylaws. He alleged in his complaint that in an effort to accomplish her goal or reducing his presence and influence in the hospital, she engaged CIMRO to conduct a peer review when the customary MEC peer review recommended no further action be taken. The complaint notes that Gustafson "received a report from CIMRO that again did not find that Plaintiff Dr. Ramos posed an imminent danger to patients" yet she was "dissatisfied with the original CIMRO report" so she "contacted CIMRO and demanded changes or additions be made to the original report; changes that would purportedly justify a summary suspension or revocation of Plaintiff Dr. Ramos' privileges."

¶ 74 Ramos further alleged that the hospital had never before hired an outside agency to conduct a peer review. The record reflects that despite the fact that he attempted to obtain all information relevant to his suspension, the hospital routinely refused to disclose the original version of the CIMRO report. When Ramos finally obtained a copy of the original CIMRO report, he learned it contained no language specifically stating that he posed an imminent danger to patient health. The trial court thwarted his efforts to depose those associated with the creation of the two different CIMRO reports, as well as the transmission of those reports to the hospital.

¶ 75 By refusing to allow Ramos to depose those associated with creation and transmission of the CIMRO report, the trial court denied him the opportunity to discover whether or not the hospital is indeed correct that the changes were merely an omission of a previously held belief or, in fact, the product of Gustafson's alleged conspiracy to reduce Ramos's influence within the hospital at all costs. Proceeding on the theory that the process the hospital engaged in to issue his summary suspension was fundamentally unfair, Ramos was entitled to explore

the circumstances surrounding the creation of two different CIMRO reports: one which specifically claimed he posed an imminent danger to patient health and the other which did not contain that specific allegation. We hold the trial court abused its discretion in prohibiting Ramos from inquiring into this matter, thereby denying him a fair trial.

¶ 76    Discovery rulings are generally within the trial court's discretion and we will not disturb them absent an abuse of that discretion. *D.C. v. S.A.*, 178 Ill. 2d 551, 559 (1997). However, great latitude is allowed in conducting discovery and the concept of relevance is broader for discovery purposes than for purposes of admitting evidence at trial. *TTX Co. v. Whitley*, 295 Ill. App. 3d 548, 556 (1998). Relevance for discovery purposes includes not only what is admissible at trial, but also that which leads to admissible evidence. *Id.* at 557.

¶ 77    We also reject defendant's assertion that any error regarding the CIMRO reports was invited by the plaintiff. Defendant begins its invited error argument noting that the physician "sought to argue that the summary suspension proceedings were 'unfair.' " Defendant alleges that any error associated with the CIMRO reports must be attributed to plaintiff since plaintiff introduced "testimony that could be rebutted by the CIMRO report." This argument lacks merit. We reject defendant's contention that plaintiff's theory that the hospital engaged in actual unfairness during the administrative review process invited this or any error associated with the changing of the CIMRO report.

¶ 78                                    B. Actual Prejudice

¶ 79    Defendant asserts that to "the extent the physician proceeded under a theory of 'fundamental unfairness,' the physician is required to prove 'actual prejudice' resulting from the unfairness." The sole authority defendant cites to support this claim is *Adkins*. Following that citation, defendant claims plaintiff can show no prejudice as the record reveals he is making more money now than prior to the suspension of his privileges and continues to increase his wages. He remains a provider with more than 300 health plans despite his summary suspension.

¶ 80    We acknowledge defendant raised this "actual prejudice" claim while responding to arguments from the plaintiff asserting he is entitled to a judgment *n.o.v.* We address this argument in the "New Trial" section of this opinion since it seems more germane to plaintiff's claim that he was improperly prevented from exploring and putting on evidence to support his claim of fundamental unfairness.

¶ 81    Defendant's citation to evidence of plaintiff's earning potential suggests that defendant believes *Adkins* stands for the proposition that there can be no "actual prejudice" if a wrongfully suspended physician makes more money after suspension than he did before suspension. The actual prejudice discussed in *Adkins* referred not to monetary losses, however, as the defendant suggests but, instead, to bias against the physician by a member of the review committee. *Adkins*, 129 Ill. 2d at 512 ("Adkins does not contend that there was actual prejudice on the part of [the] members of the Executive Committee or that the decision of the members was based on anything but an informed review of the facts.").

¶ 82    Moreover, the record reflects that plaintiff sought to remove or prevent the listing of this suspension in the National Practitioner Data Bank. At least one other Illinois court has

tangentially commented on the negative impact a report to the National Practitioner Data Bank can have on a physician's future employment. *Janes v. Centegra Health System*, 308 Ill. App. 3d 779 (1999). Certainly, if Ramos can show his suspension was improperly entered due to a fundamentally unfair process, then reporting that improperly entered suspension of clinical privileges to the National Practitioner Data Bank harms or prejudices him. Therefore, we reject the hospital's suggestion that the only way a physician can show actual prejudice when his privileges have been suspended is to prove he suffered monetary loss therefrom.

¶ 83                                    C. Motion for Substitution of Judge

¶ 84        After having two jury demands stricken in case No. 08-CH-123 for being untimely, plaintiff voluntarily dismissed that case and filed the instant action, No. 11-L-4. Plaintiff filed a jury demand along with his complaint in case No. 11-L-4 and, shortly thereafter, moved for substitution of judge pursuant to section 2-1001(a)(2) of the Code of Civil Procedure (the Code) (735 ILCS 5/2-1001(a)(2) (West 2010)). The trial court denied plaintiff's motion. We review an order denying substitution of judge as a matter of right *de novo*. *In re D.M.*, 395 Ill. App. 3d 972 (2009).

¶ 85        Plaintiff correctly notes that section 13-217 of the Code (735 ILCS 5/13-217 (West 2010)) allows for a plaintiff who voluntarily dismissed an action under section 2-1009(a) (735 ILCS 5/2-1009(a) (West 2010)) to "commence a new action within one year." 735 ILCS 5/13-217 (West 2010). It is clear that a case brought pursuant to section 13-217 is a new action and not the " 're-commencement' " of the prior action. *Wilson v. Brant*, 374 Ill. App. 3d 306, 311 (2007). Dr. Ramos's voluntary dismissal of case No. 08-CH-123 "terminated the action in its entirety." *Dubina v. Mesirow Realty Development, Inc.*, 178 Ill. 2d 496, 503 (1997). "The original and refiled actions are completely distinct actions." *Id.* at 504.

¶ 86        As there is no doubt that case No. 11-L-4 is a new and distinct action from case No. 08-CH-123, plaintiff argues the trial court improperly failed to grant his motion to substitute judge. He notes section 2-1001 of the Code mandates that when "a party timely exercises his or her right to a substitution without cause," "[e]ach party shall be entitled to one substitution of judge without cause as a matter of right." 735 ILCS 5/2-1001(a)(2)(i) (West 2010). Section 2-1001 continues that an "application for substitution of judge as of right shall be made by motion and shall be granted if it is presented before trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case, or if it is presented by consent of the parties." 735 ILCS 5/2-1001(a)(2)(ii) (West 2010).

¶ 87        Plaintiff notes no rulings had been made in case No. 11-L-4 prior to his motion to substitute. Therefore, plaintiff claims he was entitled as a matter of right to substitution of judge as it is well settled that courts " 'should lean toward favoring rather than defeating a substitution of judge.' " *In re Austin D.*, 358 Ill. App. 3d 794, 799 (2005) (quoting *Rodisch v. Commacho-Esparza*, 309 Ill. App. 3d 346, 350 (1999)). As it is equally well settled that any "and all orders entered after the improper denial of a motion to substitute judge are null and void," plaintiff maintains all orders following the improper denial of his motion to substitute are void *ab initio*. *Id.*

¶ 88        While acknowledging a party's rights under section 2-1001, defendant notes that those

rights only allow for a substitution of judge when "a party timely exercises" them. 735 ILCS 5/2-1001(a)(2) (West 2010). Courts, including this one, have long held that a motion to substitute is "untimely if it was filed after the judge has ruled on a substantive issue in the case." *In re D.M.*, 395 Ill. App. 3d 972, 976 (2009). The reason for this policy is to prevent a litigant from judge shopping after forming an opinion that the judge may be unfavorably disposed toward his case. *Id.* A motion for substitution of judge may also be properly denied, even if the judge presiding did not rule on a substantive issue, if the litigant " 'had an opportunity to test the waters and form an opinion as to the court's disposition' " of an issue. *Cincinnati Insurance Co. v. Chapman*, 2012 IL App (1st) 111792, ¶ 23 (quoting *In re Estate of Hoellen*, 367 Ill. App. 3d 240, 246 (2006)).

¶ 89    Undoubtedly, plaintiff had an opportunity to do more than just test the waters in case No. 08-CH-123. We find no reported cases in which the aforementioned principles put in place to prevent forum shopping have been applied to a newly filed suit pursuant to section 13-217 of the Code. Defendant draws our attention to *Partipilo v. Partipilo*, 331 Ill. App. 3d 394 (2002), and *In re Marriage of Kozloff*, 101 Ill. 2d 526 (1984), claiming they should guide us to conclude that prohibitions against forum shopping in these matters trump section 2-1001's right to substitute a judge.

¶ 90    The hospital argues that our supreme court unequivocally settled this matter in *Kozloff*. In *Kozloff*, our supreme court, while affirming the denial of the husband's motion to substitute judge, stated that "post-decree petitions do not constitute new actions, but merely continuations of the dissolution proceeding, and a substantive ruling on one petition will preclude a change of venue as of right on another." *Kozloff*, 101 Ill. 2d at 531.

¶ 91    Unlike the refiled petition to reduce maintenance in *Kozloff*, this action, case No. 11-L-4, is "a new action" separate and distinct from case No. 08-CH-123. 735 ILCS 5/2-1001(a)(2), 13-217 (West 2010); *Dubina*, 178 Ill. 2d at 504.

¶ 92    Defendant further claims *Partipilo v. Partipilo*, 331 Ill. App. 3d 394 (2002), supports the order denying plaintiff's motion for substitution of judge. *Partipilo* is so factually unique and dissimilar to this case, however, that we question its applicability.

¶ 93    *Partipilo* involved no less than four lawsuits between numerous parties. *Id.* The original suit was a divorce case, No. 98-D-20652, between Frank and Maria Partipilo. *Id.* at 396. Maria moved to add additional parties to the divorce case, claiming these parties and Frank conspired to deplete marital assets by diverting funds from the family business, F&V Cement. *Id.* Maria and Frank each owned a part of F&V Cement, which held numerous contracts with the City of Chicago to perform cement and paving work. *Id.* Frank moved to strike Maria's petition to add parties, claiming those matters must be litigated through tort suits. *Id.* The trial court deferred ruling on the matter and set a trial date. *Id.*

¶ 94    Four months prior to trial of the divorce case, Maria filed case No. 01-CH-6280 against Frank and at least one of the parties she sought to add to the divorce proceeding. *Id.* This suit alleged, *inter alia*, that Frank and the other defendants committed fraud against the family business. *Id.* Also pending during this time was a suit brought by the City of Chicago against Frank and Maria, case No. 01-M1-402155. *Id.* at 397. Maria cross-claimed in the M1 suit against Frank for breach of contract. *Id.* Maria filed notices of her claims to nonmarital

property in case No. 01-CH-6280 as well as No. 01-M1-402155. *Id.* She also moved to set a new trial date in the divorce case claiming Frank failed to comply with discovery. *Id.* Maria then asked the judge in the divorce case to stay that matter until the other cases could be concluded. *Id.* The judge in the divorce case, Judge Lawrence, denied her request to stay the divorce proceeding. *Id.*

¶ 95     Maria then filed another lawsuit, No. 01-CH-10785, seeking a declaratory judgment of her right to proceed with No. 01-CH-6280 prior to proceeding in the divorce case. *Id.* She asked the trial court to transfer the divorce case to the judge assigned to the newest suit, No. 01-CH-10785, and consolidate the two cases. *Id.* The trial court denied her motion and consolidated the two cases with Judge Lawrence instead. *Id.*

¶ 96     Maria then filed a motion for substitution of judge in case No. 01-CH-10785 as a matter of right under section 2-1001(a)(2). 735 ILCS 5/2-1001(a)(2) (West 2000). She noted Judge Lawrence had not ruled on any substantive matter in case No. 01-CH-10785. *Partipilo*, 331 Ill. App. 3d at 397. Judge Lawrence denied the motion. *Id.* The appellate court affirmed Judge Lawrence's denial of Maria's motion to substitute. *Id.* at 399. In doing so, the *Partipilo* court found that Judge Lawrence in fact "ruled on a substantial issue in No. 01 CH 10785" when he denied "Maria's June 2011 motion to stay the divorce case until the conclusion of No. 01 CH 6280 and No. 01 M1 402155." *Id.* The *Partipilo* court noted that case No. 01-CH-10785 "was a repackaging of Maria's previous request to continue the divorce case." *Id.* The *Partipilo* court also quoted the authorities and language cited above regarding the prohibition against judge shopping and filing motions to substitute after a party has had an opportunity to "test the waters and form an opinion as to the court's reaction to his or her claim." *Id.* at 398.

¶ 97     *Partipilo* saw four different lawsuits pending at the same time involving Frank and Maria where the case at bar involves the dismissal and conclusion of one action and the commencement of an entirely new action. That leads us to conclude *Partipilo* is, at best, tangentially relevant to the matter at hand.

¶ 98     Our supreme court's language in *Kozloff* is strong. "This court has long condemned a litigant's attempt to seek a change of venue after he has formed an opinion, based upon the court's adverse rulings, that the judge may be unfavorably disposed towards his cause." *Kozloff*, 101 Ill. 2d at 530-31. Undoubtedly, this litigant had such an opportunity. On the other hand, it would not be unreasonable to read *Kozloff* and conclude that the critical factor for the court was the fact that the petition to modify maintenance did not constitute a new action. Our best guess is that the supreme court would not endorse the exercise of the right to voluntary dismissal as an end run around the prohibition against judge shopping. We hold that under the facts of this case, where the trial judge found that plaintiff had tested the waters in the voluntarily dismissed action, the trial court did not err in denying plaintiff's motion for substitution of judge in the new action. We affirm the trial court's order denying plaintiff's motion for substitution of judge.

¶ 99                D. Plaintiff's Other Arguments Requesting a New Trial

¶ 100    For the same reasons plaintiff claims he is entitled to a judgment *n.o.v.*, which we have

-17-

identified in section I above, plaintiff claims he is entitled to a new trial. Those claims encompass arguments that he unequivocally proved the hospital violated various sections of the bylaws when suspending him. Plaintiff also identifies a number of alleged evidentiary errors made by the trial court which he claims entitles him to a new trial. Plaintiff argues: the trial court erred in admitting the HSI report; improperly barred him from presenting evidence that the findings of the fair hearing committee exonerated him; erred in failing to allow him to offer any proof that he never posed an imminent danger to the health of patients; the trial court erred in refusing to bifurcate the trial; and, finally, erred when instructing the jury. Our finding of reversible error on the issue of prohibiting the plaintiff from deposing employees from CIMRO "obviates the need to address those [additional] claims." *In re J.J.*, 316 Ill. App. 3d 817, 825 (2000).

¶ 101                              III. Judgment for Costs

¶ 102    Finally, plaintiff claims he was improperly assessed $22,649.03 of costs associated with case No. 08-CH-123 in this case, No. 11-L-4. Defendant notes that the trial judge made a specific finding that "the dismissal [of case No. 08-CH-123] was done to avoid going to trial." This finding, defendant claims, makes the award a proper sanction under Supreme Court Rule 219(e), which states:

>  "(e) Voluntary Dismissals and Prior Litigation. A party shall not be permitted to avoid compliance with discovery deadlines, orders or applicable rules by voluntarily dismissing a lawsuit. In establishing discovery deadlines and ruling on permissible discovery and testimony, the court shall consider discovery undertaken (or the absence of same), any misconduct, and orders entered in prior litigation involving a party. The court may, in addition to the assessment of costs, require *the party voluntarily dismissing a claim* to pay an opposing party or parties reasonable expenses incurred in defending the action including but not limited to discovery expenses, expert witness fees, reproduction costs, travel expenses, postage, and phone charges." (Emphasis added.) Ill. S. Ct. R. 219(e) (eff. July 1, 2002).

¶ 103    Defendant notes that our supreme court titled subsection (e), "Voluntary Dismissals and Prior Litigation." Ill. S. Ct. R. 219(e) (eff. July 1, 2002). Defendant claims inclusion of the phrase, "and Prior Litigation" signifies an intent from our supreme court to empower trial courts with the discretion to award costs in an action refiled under section 13-217 that are associated with the voluntary dismissal of "Prior Litigation." We review *de novo* the interpretation of a supreme court rule. *In re Estate of Rennick*, 181 Ill. 2d 395, 401 (1998).

¶ 104    Neither party identifies a reported case, and our research has not revealed any, in which a trial court awarded costs in an action for expenses incurred in a previous action voluntarily dismissed under section 2-1009. For several reasons, we conclude that the award was in error. Our supreme court did, however, discuss the interplay between Rule 219(e) and section 2-1009 in *Morrison v. Wagner*, 191 Ill. 2d 162 (2000).

¶ 105    *Morrison* involved a medical malpractice suit in which the plaintiff filed a motion to voluntarily dismiss pursuant to section 2-1009(a) of the Code. *Id.* at 163; 735 ILCS 5/2-1009(a) (West 2000). The circuit court denied plaintiff's motion as the trial "court apparently

-18-

believed the [plaintiffs] had failed to properly respond to certain pretrial discovery matters and were attempting to utilize section 2-1009 as a means to evade court-imposed discovery sanctions." *Morrison*, 191 Ill. 2d at 166. The supreme court held that denying plaintiffs' motion for voluntary dismissal was improper. *Id.* at 167.

¶ 106   In doing so, the *Morrison* court noted that Rule 219 "prevents voluntary dismissals from being used as an artifice for evading discovery requirements through two entirely different mechanisms. First, the rule enhances the monetary burden associated with such dismissals. Under section 2-1009(a) of the Code of Civil Procedure, plaintiffs must pay costs as a condition of taking a voluntary dismissal without prejudice. Rule 219(e), however, provides that in addition to the assessment of costs, the court may require the party seeking dismissal to pay the opposing party or parties their 'reasonable expenses incurred in defending the action including but not limited to discovery expenses, opinion witness fees, reproduction costs, travel expenses, postage, and phone charges.' " *Id.* at 166-67 (quoting Ill. S. Ct. R. 219(e) (eff. Jan. 1, 1996)).

¶ 107   The *Morrison* court continued, noting:

"When a case is refiled, the rule requires the court to consider the prior litigation in determining what discovery will be permitted, and what witnesses and evidence may be barred. [Citation.]

Because Rule 219(e) alters the consequences of taking a voluntary dismissal rather than restricting a party's right to obtain such a dismissal, the circuit court in this case had no grounds for preventing the Morrisons from voluntarily dismissing their claims and forcing them to proceed to trial. If the Morrisons deserved to be sanctioned under Rule 219(e) for dismissing their case in order to avoid compliance with discovery requirements, the court could have assessed the additional expenses specified by the rule. Any *further* adverse action could only be taken when and if plaintiffs refiled their claim in a subsequent proceeding." (Emphasis added.) *Id.* at 167.

¶ 108   This language, as well as the plain language of the rule, convinces us that while a trial court has authority to take "further" adverse action in the refiled matter such as barring witnesses or limiting discovery, "reasonable expenses incurred in defending the action including but not limited to discovery expenses, opinion witness fees, reproduction costs, travel expenses, postage, and phone charges" must be levied in the original action. After refiling the new action, the plaintiff is no longer a "party voluntarily dismissing a claim." Under the plain language of the rule, we find the trial court lacked authority to make the award. It is therefore void. *Bank of Matteson v. Brown*, 283 Ill. App. 3d 599, 606 (1996) ("It is well established that a judgment or order entered by a court that lacks the inherent power to enter the particular order is void ***.").

¶ 109   Since this is an issue of first impression, we will address alternate reasons why we believe the award was improper. Defendant makes no argument that the trial court awarded the $22,649.03 in costs as a discovery sanction. Instead, defendant specifically draws our attention to the trial court's specific finding that "the dismissal was done to avoid going to trial."

¶ 110   Whether "a set trial date constitute[s] a discovery deadline, order, or applicable rule for

purposes of assessing expenses pursuant to Rule 219(e) when a suit is voluntarily dismissed" (internal quotation marks omitted) was specifically posed to the court in *Scattered Corp. v. Midwest Clearing Corp.*, 299 Ill. App. 3d 653, 656 (1998). Justice Theis, writing for the *Scattered Corp.* court, found no need to address that issue, noting that Rule 219(e) "requires the circuit court to make a preliminary finding of misconduct, analogous to the 'unreasonable noncompliance' standard invoked in Rule 219(c) cases [citation] ***. *** To determine whether the noncompliance is unreasonable, the standard is whether the conduct of the noncomplying party shows a deliberate, contumacious or unwarranted disregard for the court's authority. *** We believe that Rule 219(e) targets those strategic and tactical litigation decisions which, having crossed the line of vigorous advocacy, become decisions aimed no longer at besting the opposing party but rather at undermining the integrity of the judicial system." *Id.* at 659-60.

¶ 111    Following those statements, the *Scattered Corp.* court noted that the circuit court made no specific finding of misconduct or unreasonable noncompliance with any court order. *Id.* at 660. There had been no " 'allegation of dishonesty or bad conductment [*sic*].' " *Id.* The court continued, stating, "While the circuit court determined that this type of voluntary dismissal was contemplated by Rule 219(e), the court did not find that the dismissal itself, which necessarily avoided trial, evidenced unreasonable noncompliance with any discovery deadline, order or applicable rule by the plaintiff." *Id.* at 661.

¶ 112    Similarly, while we understand that plaintiff's dismissal "necessarily avoided trial," our review of the record fails to identify any finding by the trial court indicative of misconduct or unreasonable noncompliance with a court order. Quite the contrary. Defendant acknowledges that the trial court merely found plaintiff took a voluntarily dismissal "to avoid proceeding to trial on the date set by the case management order." Moreover, defendant's motion seeking costs did not even allege that plaintiff, either by filing a motion for voluntary dismissal or otherwise, engaged in misconduct. Therefore, assuming it is proper to award Rule 219(e) costs and expenses in the refiled action, it was not proper here.

¶ 113    Finally, the analysis in *Scattered Corp*. supports our conclusion that Rule 219(e) does not allow a trial court to level monetary sanctions in a refiled action for events which occurred in a voluntarily dismissed cause. The court observed that "the expenses authorized under Rule 219(e) serve not as a sanction *per se*, but rather as a deterrent to the dilatory and manipulative use of a plaintiff's voluntary dismissal. This prophylactic intent is consistent with the purpose behind Rule 219(c) in encouraging compliance with the entire discovery process." *Id.* at 660. Common sense dictates that any possible deterrent effect is lost if expenses and fees are not awarded as part of the original action. One facing additional costs and expenses might rethink his decision to voluntarily dismiss. The award of costs and expenses related to the dismissed case in the refiled case can only be a sanction. It seems incongruous to give a plaintiff an absolute right to dismiss, let him dismiss, and to then award monetary sanctions against him when he refiles.

¶ 114    We vacate the trial court's order awarding defendant $22,649.03 in costs and expenses.

¶ 115                              CONCLUSION

¶ 116      For the foregoing reasons, we affirm the circuit court's order denying plaintiff's motion for substitution of judge and denying plaintiff's motion for judgment *n.o.v.*; we reverse and vacate the order awarding costs and expenses, as well as the judgment in favor of defendant. We remand for further proceedings consistent with this opinion.

¶ 117      Affirmed in part, vacated in part, and reversed; cause remanded.