# Illinois Official Reports

## Appellate Court

---

### *LB Steel, LLC v. Carlo Steel Corp.*, 2018 IL App (1st) 153501

---

| | |
|---|---|
| Appellate Court Caption | LB STEEL, LLC, and THE CITY OF CHICAGO *ex rel.* LB STEEL, LLC, Plaintiffs, v. CARLO STEEL CORPORATION; WALSH CONSTRUCTION COMPANY; THE CITY OF CHICAGO; and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, Defendants (LB Steel, LLC, Plaintiff and Counterdefendant-Appellant and Cross-Appellee; Carlo Steel Corporation, Defendant, Counterplaintiff, and Counterdefendant-Appellee and Cross-Appellant; Walsh Construction Company, Defendant and Counterplaintiff-Appellee and Cross-Appellant; Travelers Casualty and Surety Company of America, Defendant and Counterplaintiff-Appellee and Cross-Appellant).–THE CITY OF CHICAGO, Plaintiff, v. MURPHY/JAHN, INC. ARCHITECTS; WERNER SOBEK INGENIUERE GmbH & CO. KG; RUBINOS & MESIA ENGINEERS, INC.; TURNER CONSTRUCTION-O'BRIEN, KREITZBERG, LLC; TURNER CONSTRUCTION COMPANY; O'BRIEN-KREITZBERG, INC.; URS CORPORATION; McCLIER CORPORATION d/b/a O'Hare Partners; AAC DESIGNERS BUILDERS, INC. d/b/a Austin AECOM Company; COTTER CONSULTING, INC.; WALSH CONSTRUCTION COMPANY; BOWMAN, BARRETT & ASSOCIATES, INC.; and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, Defendants (Walsh Construction Company, Defendant, Third-Party Plaintiff, Third-Party Counterdefendant-Appellee and Cross-Appellant; Travelers Casualty and Surety Company of America, Defendant-Appellee and Cross-Appellant; LB Steel, LLC, Third-Party Defendant and Third-Party Counterplaintiff-Appellant and Cross-Appellee; Carlo Steel, Counterdefendant-Appellee and Cross-Appellant).–LB STEEL, LLC, Plaintiff, v. CAL TESTING SERVICES, INC. d/b/a Calumet Testing Services, Defendant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-3501 |

| | |
|---|---|
| Filed | September 28, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 05-CH-2675, 07-CH-3886, 08-L-6675, 08-L-3419; the Hon. John C. Griffin, Judge, presiding. |
| Judgment | Dismissed in part, affirmed in part, reversed in part, judgment entered, and remanded. |
| Counsel on Appeal | Daniel P. Dawson and Joseph A. Ptasinski, of Nisen & Elliott, LLC, of Chicago, for appellant. |
| | E. Bryan Dunigan, of Chicago, for appellee Carlo Steel Corporation. |
| | James R. Figliulo, Michael K. Desmond, and Gregory L. Stelzer, of Figliulo & Silverman P.C., and Patrick J. Enright, Joseph O. Enright, and Colleen B. Cavanaugh, of O'Rourke, Hogan, Fowler & Dwyer, LLC, both of Chicago, for other appellees. |
| Panel | JUSTICE HOFFMAN delivered the judgment of the court, with opinion. Presiding Justice Rochford and Justice Hall concurred in the judgment and opinion. |

**OPINION**

¶ 1    The appellant, LB Steel, LLC (LB Steel), and the cross-appellants, Walsh Construction Company (Walsh), Travelers Casualty and Surety Company of America (Travelers), and Carlo Steel Corporation (Carlo Steel), appeal from orders of the circuit court of Cook County entered in consolidated cases involving a construction project at O'Hare International Airport. On appeal, LB Steel contends that the circuit court erred by (1) setting off certain judgments entered in its favor against a judgment entered in favor of Walsh and (2) failing to reduce Walsh's judgment by the value of a payment from its insurer, Zurich American Insurance Company (Zurich). Additionally, LB Steel contends that Walsh's judgment must be reduced by the amount due under its policy with another insurer, St. Paul Guardian Insurance Company (St. Paul). In their respective cross-appeals, Walsh, Travelers, and Carlo Steel fix additional

issues for review, which we address *infra*. For the following reasons, we dismiss the cross-appeal of Carlo Steel, affirm the circuit court's judgment in part and reverse it in part, enter a judgment in LB Steel's favor against Walsh and Carlo Steel for $4,771,688 on LB Steel's claim for *quantum meruit*, and remand.

¶ 2        The procedural history of this case is lengthy. The following factual recitation, taken from the pleadings, exhibits, and evidence adduced at trial, contains only what is necessary for our disposition of the issues. Additional facts will be included as needed throughout this opinion.

¶ 3        In January 2003, Walsh, a general contractor, entered into a contract (Prime Contract) with the City of Chicago (City) to construct a steel canopy above several terminals at O'Hare International Airport (Project). In connection with the Project, Walsh obtained a public construction bond from Travelers (Travelers bond) and an insurance policy from Zurich (Zurich policy). Walsh subcontracted with Carlo Steel, a construction company, to build the steel canopy (Subcontract). The Subcontract stated that, if Carlo Steel commits a "material breach" of the Subcontract, Walsh may "withhold payment" from Carlo Steel "pending corrective action to the extent required by and to the satisfaction of [Walsh] and the Architect/Engineer."

¶ 4        In March 2003, Carlo Steel subcontracted with LB Steel, a steel fabricator, to manufacture the steel canopy and 35 steel support columns (Sub-Subcontract). The Sub-Subcontract provided that, "[t]o the extent terms of the [Prime Contract] *** apply" to LB Steel's work, Carlo Steel and LB Steel assumed toward each other the same "obligations, rights, duties, and redress" that Walsh and Carlo Steel assumed under the Prime Contract. Additionally, the Sub-Subcontract provided that "Carlo Steel may reject a *** payment application" from LB Steel "as may be reasonably necessary to protect Carlo Steel from loss or damage caused by" LB Steel's failure to "correct rejected, defective, or nonconforming *** work." Subsequently, LB Steel retained an engineering firm, R.I. Johnson Associates (R.I. Johnson), to design welding for the canopy and support columns and entered into a contract with Cal Testing, Inc. (Cal Testing) to analyze the welding (weld-testing contract).

¶ 5        LB Steel delivered the steel support columns to the Project site between December 2003 and March 2004, along with elements of the steel canopy. In December 2004, the City discovered cracks in the canopy's welding; some of the welds were performed by LB Steel, and others were performed by another contractor. During the investigation, Walsh withheld payment from Carlo Steel, and Carlo Steel, in turn, withheld payment from LB Steel.

¶ 6        On January 21, 2005, LB Steel issued a notice of claim on the Travelers bond, alleging it had not been paid $7,012,856 under the Sub-Subcontract. Subsequently, on February 9, 2005, LB Steel filed an action against the City, Carlo Steel, and Walsh in the circuit court of Cook County (case number 05 CH 2675). LB Steel's complaint was amended on several occasions, with the last iteration being a six-count third amended complaint adding Travelers as a defendant. LB Steel alleged a lien against public funds, directed against "the City, Walsh and Carlo, and each of them" (count I); breach of the Sub-Subcontract by Carlo Steel (count II); *quantum meruit* against Carlo Steel and Walsh (count III); declaratory judgment against Carlo Steel (count IV); a public construction bond claim against Travelers (count V); and unjust enrichment by Carlo Steel and Walsh (count VI).

¶ 7        While LB Steel's complaint was pending, the City continued investigating the defective welding in the steel canopy and ultimately faulted its structural engineer and not the contractors. However, in November 2005, the City discovered additional defects in LB Steel's

welding for the steel support columns it manufactured. The City's structural engineer concluded that, if other welding was also defective, "the overall structural stability of the canopy structure *** [could be] endangered." Due to these findings, Walsh, the City, and the City's engineers developed a plan to identify and remediate welds that were critical to the canopy's structural integrity.

¶ 8    While the remediation effort was underway, Walsh and Travelers filed a counterclaim against Carlo Steel, alleging that it breached the Subcontract, and Carlo Steel filed a counterclaim against LB Steel, claiming that it breached the Sub-Subcontract. Later, Walsh and Carlo Steel executed an assignment agreement by which Carlo Steel assigned the Sub-Subcontract to Walsh "together with any and all claims which [Carlo Steel] has, or may hereafter have, against [LB Steel] and the City." Walsh agreed to "defend *** any and all counter-suits or claims brought by any of the Subcontractors against [Carlo Steel] relating to" the Project and undertook to "indemnify" Carlo Steel for claims arising from Walsh's "failure to provide payment to [Carlo Steel] which in turn would have been provided to the Subcontractors."

¶ 9    On April 13, 2007, the City filed an action against Walsh and Travelers in the circuit court of Cook County (case number 07 L 3886). In the same proceeding, Walsh filed a third-party complaint against LB Steel and Cal Testing, which was later superseded by a five-count second amended third-party complaint. Walsh alleged breach of the Sub-Subcontract by LB Steel (count I), professional negligence by Cal Testing and LB Steel (counts II and III, respectively), fraud by LB Steel (count IV), and breach of the weld-testing contract by Cal Testing based on Walsh's status as a third-party beneficiary (count V). LB Steel filed a counterclaim that raised several claims similar to those contained in its third amended complaint in case number 05 CH 2675. Specifically, LB Steel alleged breach of the Sub-Subcontract by both Carlo Steel and Walsh (count I); a lien against public funds, directed against "the City, Walsh and Carlo, and each of them" (count II); *quantum meruit* against Carlo Steel and Walsh (count III); a public construction bond claim against Travelers (count IV); and unjust enrichment by Carlo Steel and Walsh (count V). In count VI of its counterclaim, LB Steel alleged breach of contract against Cal Testing.

¶ 10    On June 19, 2008, LB Steel filed a complaint against Cal Testing in the circuit court of Cook County, which was later superseded by a second amended complaint alleging one count of breach of contract (case number 08 L 6675). Then, on July 29, 2009, LB Steel filed a third-party complaint in case number 07 L 3886, alleging breach of contract against Carlo Steel. In a series of orders entered in July 2009, the trial court consolidated the proceedings in case numbers 05 CH 2675, 07 L 3886, and 08 L 6675.[1]

¶ 11    On April 4, 2013, Cal Testing filed a counterclaim for interpleader in case number 07 L 3886, seeking to deposit $1,812,696 with the clerk of the circuit court, the amount remaining under its insurance policy, because "[b]oth Walsh and LB Steel have claimed entitlement [to the money]." In response, Walsh and LB Steel filed counterclaims for those funds. By order of the trial court, Cal Testing deposited the funds on June 4, 2013, and was dismissed from the litigation.

---

[1]Case number 08 L 3419, another action arising from the Project and to which Walsh was a defendant, was also consolidated but is not relevant to this appeal.

¶ 12    On June 28, 2013, Walsh and the City filed a joint motion in case number 07 L 3886, asserting that, due to LB Steel's lien on public funds, the City was "withholding from Walsh $1,554,654.00" under the Prime Contract and sought to deposit that sum with the clerk of the circuit court. The trial court granted Walsh's and the City's motion on September 13, 2013. Subsequently, on November 12, 2013, the court entered an order stating that the deposited funds "shall be credited by the parties as if paid by the City to Walsh" and that "LB Steel's lien is released as to the City only and attaches to the deposited funds." The City deposited the funds that day.

¶ 13    On August 24, 2015, the matter proceeded to a bench trial, where the following claims were before the court. According to its trial brief, LB Steel proceeded on (1) counts I-III and V-VI of its third amended complaint in case number 05 CH 2675, (2) the corresponding claims raised in counts I-V of its counterclaim in case number 07 L 3886, and (3) its counterclaim for the funds that Cal Testing deposited with the clerk of the circuit court in case number 07 L 3886. Walsh, in its trial brief, stated that it proceeded on counts I, III, and IV of its second amended third-party complaint in case number 07 L 3886 and maintained that "LB Steel's defective work *** was substantial and extensive." The record shows that, prior to trial, the court entered summary judgment in favor of LB Steel and against Walsh on Walsh's claim for professional negligence raised in count III of its second amended third-party complaint.

¶ 14    The evidence adduced at trial established that, following the initial discovery of LB Steel's defective column welds in November 2015, Walsh, the City, and the City's engineers identified 13 types of welds on each of the 35 columns that required inspection and testing. Most of those welds were found to be defective but did not require remediation. The welds that required remediation, however, included welds that, according to an engineer for Walsh, were "critical for the safety of the whole canopy." Some of those welds had cracks that rendered them "totally ineffective" or contained "only a fraction" of the required volume, and in some cases, "there was no weld touching the metal and connecting to both sides" of the columns. Pursuant to a plan developed with the City and its engineers, Walsh erected temporary shoring around the canopy and repaired or retrofitted the defective welds that required remediation. An expert for LB Steel opined that the defective welds, in aggregate, constituted approximately 1000 feet out of a total of 39 miles of welding performed by LB Steel.

¶ 15    During proceedings on October 14, 2015, immediately before the trial judge delivered his findings, the parties agreed that Walsh and Carlo Steel had retained a total of $4,771,688 due to LB Steel under the Sub-Subcontract following the discovery of cracks in the welding. Counsel for Walsh maintained that it "had every right to withhold that payment under the contract because of the defective work" but conceded that, "if our costs to repair are awarded and we are made whole, then LB Steel would be entitled to reduce" the judgment entered against it by "the amount that would have been due [to LB Steel] had [it] properly performed."

¶ 16    Following this discussion, the trial judge delivered his findings from the bench and also entered a comprehensive written judgment order. In his oral findings, the judge observed that, although the parties proffered "voluminous documents" in evidence, LB Steel provided neither "as-built drawings" showing that it produced the welds according to specification nor "notes *** regarding visual inspection." Because such evidence was "within [LB Steel's] power to produce," the judge inferred that "the as-builts and visual inspections would be adverse to LB Steel."

¶ 17        As to Walsh's claim for breach of contract by LB Steel in count I of its second amended third-party complaint, the judge found that "the contract documents support Walsh's theory of the case" and that "there was a need for remediation due to the defective welds, not the design." The judge awarded Walsh $27.5 million, noting that it made "a reasonable and responsible attempt to mitigate damages and protect the public safety" and that its damages "are the costs it incurred to investigate and repair the defective welds." In so holding, the judge stated that $8 million that Walsh received under the Zurich policy would not be deducted from the award because "the insurance policy is clear as to what was covered by the payment." However, the judge found that Walsh did not prove its claim for fraud by LB Steel in count IV of its second amended third-party complaint.

¶ 18        As to LB Steel's claim for breach of contract in count II of its third amended complaint, the judge awarded LB Steel $6.5 million, with "the City lien funds *** applied to that amount," but did not make specific findings of fact. The judge also denied LB Steel's claims for *quantum meruit* and declaratory judgment without making any factual findings.[2] Finally, the judge entered "an additional judgment in [LB Steel's] favor *** for the Cal Testing funds on deposit."

¶ 19        Counsel for Walsh then argued that, if Walsh "obtain[s]" the funds awarded to LB Steel, that award would "reduc[e]" the judgment in Walsh's favor because "Walsh withheld the contract amount as [it] had a right to do under the contract, and that should be offset against the amount of what is claimed." In response, counsel for LB Steel stated that, pursuant to section 12-178 of the Code of Civil Procedure (Code) (735 ILCS 5/12-178 (West 2014)), "setoff is not appropriate given the different capacities for these different claims." LB Steel's counsel also stated that his firm, Conway & Mrowiec, filed a "notice of attorneys' lien in this case, and that is one of the specific exceptions to setoff" under the Code. An attorney for MB Financial Bank (MB Financial) then addressed the court, stating that MB Financial has "a perfected lien security interest in all property of LB Steel," including "the judgments *** entered in favor of LB Steel, the rights to the $1.5 million *** under public statute, the $6.5 million judgment against Travelers and *** [the] judgment against Cal Testing." MB Financial's attorney argued, therefore, that "the rights of setoff should not be determined at this time." A copy of Conway & Mrowiec's lien notice appears in the record; however, the record does not contain an appearance or lien notice filed by MB Financial, and attorneys for both Walsh and Carlo Steel objected to its participation in the proceedings. Following these discussions, the trial judge stated:

"[A]t the end of the day, here is the way it should be: There is a $27,500,000 judgment entered.

LB [Steel] is entitled to credit for the $6,500,000, and the $1,812,696 for a total of $8,312,696.

The net is [$]19,187,304. I do think these are all—I don't remember the exact terminology—interrelated.

I think that pursuant to 5/12-176 [of the Code], [LB Steel] is entitled to a setoff so Walsh should get the money *** that is being held by the Clerk."

_____

[2]Although the trial court denied LB Steel's claim for declaratory judgment against Carlo Steel in count IV of its third amended complaint, LB Steel's pretrial brief, as noted, did not specify that it was proceeding on that claim.

¶ 20        The trial court entered a written judgment order on October 14, 2015. Because of its relevance to the issue on appeal, we quote the judgment order at length. It states, in relevant part:

"1. Judgment is entered in favor of Walsh *** and against LB Steel, *** on Count I of Walsh's Second Amended Third-Party Complaint *** for Breach of Contract in the amount of $27,500,000.00;

2. Judgment is entered in favor of LB Steel and against Walsh on Count IV of Walsh's Second Amended Third-Party Complaint *** for fraud;

3. Judgment is entered in favor of LB Steel and against Carlo Steel *** and Walsh on Count I of LB Steel's Counterclaim *** (and Count II of LB Steel's Third Amended Complaint ***) for breach of contract, in the amount of $6,500,000.00;

4. Judgment is entered in favor of LB Steel and the City of Chicago for the use and benefit of LB Steel and against Travelers *** on Count IV of LB Steel's Counterclaim *** (and Count V of LB Steel's Third Amended Complaint ***) on the bond claim in the principal amount of $6,500,000.00[;]

5. Judgment is entered in favor of LB Steel and against Walsh on Count II of LB Steel's Counterclaim *** (and Count I of LB Steel's Third Amended Complaint ***) for lien *** in the amount of $1,554,654.00;

6. Judgment is entered in favor of LB Steel, on Count VI of LB Steel's *** Answer and Counterclaim *** and LB Steel's Answer and Counterclaim for Interpleader *** (and LB Steel's Complaint against Cal Testing ***) for the principal amount of $1,812,696.00 plus accrued interest that was deposited with the Clerk of the Court by Cal Testing ***. This $1,812,696.00 is independent of, and in addition to, the $6,500,000.00 awarded to LB Steel under Counts I, II, and IV of LB Steel's *** Counterclaim;

7. Judgment is entered in favor of Walsh and against LB Steel on Count III of LB Steel's Counterclaim *** and Count III of LB Steel's Third Amended Complaint *** for quantum meruit;

8. Count IV of LB Steel's Third Amended Complaint *** for declaratory judgment against Carlo [Steel] is subsumed in other counts;

9. Judgment is entered in favor of Walsh and Carlo Steel and against LB Steel on Count VI of LB Steel's Third Amended Complaint *** for unjust enrichment;

10. Judgment is entered in favor of LB Steel and against Carlo Steel on Carlo Steel's counterclaim against LB Steel ***. Judgment is entered for Carlo Steel and against LB Steel on the LB Steel Third-Party Claim against Carlo Steel;[3]

11. LB Steel shall be entitled to a credit for $6,500,000.00 based upon its contract claims, bond claim, and lien claim and $1,812,696.00 plus accrued interest based upon [its] claims against [Cal] Testing and the funds deposited by [Cal] Testing (plus accrued interest), which amounts shall be set-off against Walsh['s] *** judgment, for a

---

[3]Although the trial court denied LB Steel's claim for breach of contract raised in its third-party complaint against Carlo Steel, LB Steel's pretrial brief, as noted, did not specify that it was proceeding on that claim.

net judgment in favor of Walsh *** and against LB Steel[ ] *** in the amount of $19,187,304.00, less accrued interest from funds deposited by [Cal] Testing;

12. The judgments against Travelers *** and Carlo [Steel] *** are hereby satisfied in full by reason of the set-off and/or recoupment of the judgment in favor of Walsh *** as set forth in paragraph 11 above ***;

13. IT IS HEREBY ORDERED that the Clerk *** shall release the $1,554,654.00 deposited by the City of Chicago *** plus accrued interest, to Walsh ***;

14. IT IS HEREBY ORDERED that the Clerk *** shall release the $1,812,696.00 deposited by Cal Testing[ ] *** plus accrued interest, to Walsh ***;

\*\*\*

16. Notwithstanding the Parties[ʼ] claim[s] for attorneys' fees and costs against LB Steel[ ] *** and the continuance of this matter for this issue, this Court makes an express finding that there is no just reason for delaying either enforcement or appeal or both of this Judgment Order pursuant to Illinois Supreme Court Rule 304(a)."

¶ 21 On October 18, 2015, LB Steel voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code (Bankruptcy Code) (11 U.S.C. § 1101 *et seq.* (2012)) in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division.[4] Subsequently, the bankruptcy court modified the automatic stay to allow LB Steel and Walsh to file notices of appeal and cross-appeal from the trial court's judgment order, which they filed on December 16, 2015, and December 23, 2015, respectively. Walsh's notice of cross-appeal also listed its surety, Travelers, as a cross-appellant. The record does not show whether Carlo Steel sought to modify the automatic stay, nor is Carlo Steel mentioned in the bankruptcy court's order allowing Walsh to file its notice of cross-appeal. Notwithstanding, Carlo Steel filed a notice of cross-appeal from the judgment order on January 4, 2016.

¶ 22 LB Steel filed two adversary complaints against Walsh in the bankruptcy court, arguing that the setoffs imposed by the trial court were invalid or avoidable. In memorandum opinions, the bankruptcy court held that (1) the *Rooker-Feldman* doctrine barred LB Steel's challenge to the setoffs and, therefore, the bankruptcy court would not disturb the trial court's determination that "the obligations at issue were mutual for purposes of setoff";[5] (2) the funds that Cal Testing and the City deposited with the clerk of the circuit court were not part of the bankruptcy estate; and (3) the bankruptcy court would not conduct further proceedings until the present appeal is resolved. On May 10, 2016, the bankruptcy court entered an order modifying the automatic stay "to allow LB Steel and Walsh to proceed with the [a]ppeals." That order did not mention Carlo Steel's cross-appeal.

¶ 23 As an initial matter, although the parties do not dispute jurisdiction, this court has an independent duty to consider its jurisdiction before reaching the merits of the case. See *Almgren v. Rush-Presbyterian-St. Luke's Medical Center*, 162 Ill. 2d 205, 210 (1994). When, as here, multiple parties or claims are involved in an action and the trial court "has made an express written finding that there is no just reason for delaying either enforcement or appeal"

---

[4]This court "may take judicial notice of public documents which are included in the records of other courts," including the bankruptcy court. *Seymour v. Collins*, 2015 IL 118432, ¶ 6 n.1.

[5]The *Rooker-Feldman* doctrine "prevents a party who is complaining about an injury caused by a state-court judgment from seeking redress in a lower federal court." *Vlastelica v. Brend*, 2011 IL App (1st) 102587, ¶ 34.

of a judgment that is final as to one or more but fewer than all of the parties or claims, an appeal must be filed within 30 days of such judgment. Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017); R. 304(a) (eff. Mar. 8, 2016). In this case, the trial court entered its judgment order on October 14, 2015. LB Steel filed its notice of appeal on December 16, 2015, Walsh and Travelers filed their joint notice of cross-appeal on December 23, 2015, and Carlo Steel filed its notice of cross-appeal on January 4, 2016. Thus, none of the notices of appeal or cross-appeal were filed within the 30-day period. However, the bankruptcy petition filed by LB Steel on October 18, 2015, calls into play two provisions from the Bankruptcy Code that are relevant for determining whether the notices of appeal and cross-appeal were timely filed.

¶ 24    Turning first to LB Steel's appeal, section 108(b) of the Bankruptcy Code provides that "if applicable nonbankruptcy law *** fixes a period within which the debtor *** may file any pleading *** [or] notice" or "perform any other similar act," and that period "has not expired before the date of the filing of the petition," the "trustee" may file such notice before the later of "(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) 60 days after the order for relief." 11 U.S.C. § 108(b) (2012); see also 11 U.S.C. § 301(b) (2012) ("[t]he commencement of a voluntary [bankruptcy] case *** constitutes an order for relief"). Federal courts have recognized that, although section 108(b) of the Bankruptcy Code does not expressly reference notices of appeal, " '[f]iling a notice of appeal is at least a "similar act" with respect to *** filing a "pleading" or a "notice." ' " *Local Union No. 38, Sheet Metal Workers' International Ass'n, AFL-CIO v. Custom Air Systems, Inc.*, 333 F.3d 345, 347 (2d Cir. 2003) (quoting *Autoskill Inc. v. National Educational Support Systems, Inc.*, 994 F.2d 1476, 1484 (10th Cir. 1993), *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011)). Further, both federal and state courts have found that section 108(b) of the Bankruptcy Code applies to a debtor in possession in a Chapter 11 bankruptcy proceeding, who "essentially functions as the trustee." *Custom Air Systems, Inc.*, 333 F.3d at 348; *Hoang v. Hewitt Avenue Associates, LLC*, 936 A.2d 915, 922 n.3 (Md. Ct. Spec. App. 2007). These decisions comport with this court's application of section 108(b) of the Bankruptcy Code in other contexts. See, *e.g.*, *In re Application of the County Collector*, 367 Ill. App. 3d 34, 35 (2006) (where the owner of liened property filed a voluntary bankruptcy petition within the time for redeeming the lien, "the redemption period was extended 60 days" under section 108(b) of the Bankruptcy Code). Consequently, LB Steel's Chapter 11 bankruptcy petition, filed on October 18, 2015, extended its deadline to file a notice of appeal from the trial court's October 14, 2015, judgment order by 60 days, to December 17, 2015. The notice of appeal filed by LB Steel on December 16, 2015, was, therefore, timely for purposes of establishing this court's jurisdiction.

¶ 25    As to Walsh's and Travelers' joint notice of cross-appeal, section 362(a) of the Bankruptcy Code (11 U.S.C. § 362(a) (2012)) automatically stays "all entities," immediately upon the filing of the bankruptcy petition, from "the commencement or continuation *** of a judicial, administrative, or other action *** against the debtor that was or could have been commenced before the commencement of the [bankruptcy] case" unless a party obtains relief from the automatic stay. See *In re Application of the County Treasurer & ex officio County Collector of Cook County*, 308 Ill. App. 3d 33, 39-40 (1999). Here, the automatic stay resulting from LB Steel's October 18, 2015, bankruptcy petition barred Walsh and Travelers from appealing the trial court's October 14, 2015, judgment order until the bankruptcy court granted relief from

the stay on December 23, 2015. See *G.M. Fedorchak & Associates, Inc. v. Chicago Title Land Trust Co.*, 355 Ill. App. 3d 428, 432 (2005) (although a party failed to file a notice of appeal with 30 days of a final judgment, "the automatic stay barred [that party] from appealing any claim *** until the bankruptcy court granted relief from the stay"). Thus, under section 362(a) of the Bankruptcy Code, Walsh and Travelers could not file a notice of cross-appeal until December 23, 2015. Consequently, the joint notice of cross-appeal that they filed on that date was timely and invoked this court's jurisdiction. See *id.*

¶ 26        Carlo Steel's cross-appeal is also controlled by section 362(a) of the Bankruptcy Code. The record, however, does not show that Carlo Steel sought to modify the automatic stay in the bankruptcy court, nor is Carlo Steel mentioned in the bankruptcy court's orders modifying the automatic stay to permit LB Steel and Walsh to file their notices of appeal and cross-appeal. Carlo Steel, in its brief on cross-appeal, posits that the bankruptcy court's order "modified the stay to allow the filing of *[c]ross-[a]ppeals*," but the bankruptcy court's order of December 23, 2015, states only that "[t]he automatic stay is modified *** to allow *Walsh to file its Notice of Cross Appeal*" (emphases added). Further, the bankruptcy court's May 10, 2016, order modifying the automatic stay "to allow LB Steel and Walsh to proceed with the [a]ppeals" did not mention a cross-appeal by Carlo Steel. It is well established that, "in a direct appeal from the trial court, the transcript of the record must reveal the basis for the jurisdiction of the appellate court" (*Tunca v. Painter*, 2012 IL App (1st) 093384, ¶ 25), and a reviewing court must "dismiss an appeal if jurisdiction is lacking" (*Xcel Supply, LLC v. Horowitz*, 2018 IL App (1st) 162986, ¶ 26). As the record does not show that the bankruptcy court lifted the automatic stay to permit Carlo Steel to file its notice of cross-appeal from the trial court's October 14, 2015, judgment order, Carlo Steel has not established that this court has jurisdiction over its cross-appeal. See, *e.g.*, *Application of the County Treasurer*, 308 Ill. App. 3d at 44-45 (a notice of appeal filed in violation of the automatic stay was "void *ab initio*," which deprived the reviewing court of jurisdiction and required it to dismiss the appeal). Carlo Steel's cross-appeal is, therefore, dismissed.[6]

¶ 27        Turning to the merits of the instant appeals, we begin with Walsh's initial contention on cross-appeal that, notwithstanding the terminology used in the judgment order, "the $6.5 million 'judgment' ostensibly awarded to LB Steel" does not "reflect a judicial determination" that Carlo Steel or Walsh breached the Sub-Subcontract.[7] Rather, Walsh argues that the judgment order shows that LB Steel "lost its breach of contract claim and received only a 'credit' for the labor and materials it was acknowledged to have provided" and for which Carlo Steel was contractually entitled to withhold payment pending adjudication of the breach of contract claim that it assigned to Walsh. According to Walsh, this reading of the judgment order avoids the "irrational" result of requiring it to pay LB Steel $6.5 million, return the $1,554,654 and $1,812,696 that were deposited with the clerk of the circuit court by the City and Cal Tech, respectively, and pursue its award of $27.5 million against LB Steel in the

---

[6]Although we dismiss Carlo Steel's cross-appeal for lack of jurisdiction, we observe that the sole assignment of error in its brief on appeal, namely, that the trial court erred by granting judgment in favor of LB Steel on its claim for breach of the Sub-Subcontract, is also raised by Walsh and addressed in this opinion.

[7]As Walsh and Travelers filed a joint notice of cross-appeal and brief on cross-appeal, we will refer to their arguments, collectively, as Walsh's.

bankruptcy court. Therefore, Walsh argues that this court should "give effect to the [c]ircuit [c]ourt's stated intentions of awarding [it] a net judgment" or, alternatively, "modify the Judgment Order to expressly provide that LB Steel is only entitled to a 'credit,' not a 'judgment.' "

¶ 28     In interpreting the trial court's judgment order, the "determinative factor" is "the intention of the court as gathered from all parts of the judgment itself," which we construe in the same manner as other written instruments. *Fieldcrest Builders, Inc. v. Antonucci*, 311 Ill. App. 3d 597, 605 (1999). The trial court's judgment should be examined "with reference to the issues it was intended to decide, and it is not the form *** which is determinative but the substance and effect of the adjudication." *Virzint v. Beranek*, 202 Ill. App. 3d 511, 514 (1990). While an unambiguous judgment will be enforced as drafted, an ambiguous judgment should be read in conjunction with the entire record, including the pleadings and issues, and construed in accordance therewith. *Fieldcrest Builders, Inc.*, 311 Ill. App. 3d at 605.

¶ 29     In this case, a careful reading of the trial court's judgment order and oral pronouncements reveals no ambiguity. The judge expressly stated that "judgment" was entered for LB Steel on counts I, II, and V of its third amended complaint in case number 05 CH 2675; counts I, II and IV of its counterclaim in case number 07 L 3886; and its counterclaim for the funds that Cal Testing deposited with the clerk of the circuit court in case number 07 L 3886. Although Walsh maintains that the judgments entered in LB Steel's favor could inconvenience its efforts to enforce the judgment entered in its own favor, such circumstances do not establish that the judgment order was unclear or that the trial court intended its words to convey something other than their plain meaning. See *Garcia v. Gutierrez*, 331 Ill. App. 3d 127, 129 (2002) (recognizing that "[a]n order is to be construed in a reasonable manner that gives effect to the apparent intention of the trial court"). Consequently, we reject Walsh's contention that, contrary to the plain language of the judgment order, the trial court did not enter judgment in LB Steel's favor on its breach of contract claim in count II of its third amended complaint and count I of its counterclaim.

¶ 30     Walsh contends, however, that the trial court erred in entering judgment in favor of LB Steel on its breach of contract claim against it and Carlo Steel in case numbers 05 CH 2675 and 07 L 3886 because Carlo Steel had the right to withhold funds from LB Steel due to the defective welds. LB Steel, in response, maintains that Carlo Steel committed the first material breach of contract by withholding payment prior to the discovery of the defective support column welds that were discovered in November 2005.

¶ 31     A material breach of contract constitutes the "failure to do an important or substantial undertaking set forth in a contract." *Mayfair Construction Co. v. Waveland Associates Phase I Ltd. Partnership*, 249 Ill. App. 3d 188, 202-03 (1993). Whether a material breach of contract has been committed is a question of fact. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 72 (2006). As such, the trial court's determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id.* A judgment is against the manifest weight of the evidence only "if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 32     We begin our analysis with the relevant contractual language. The Subcontract between Walsh and Carlo Steel for the construction of the steel canopy stated that, if Carlo Steel commits a "material breach" of the Subcontract, Walsh may "withhold payment" from Carlo

Steel "pending corrective action." In turn, the Sub-Subcontract between Carlo Steel and LB Steel for the manufacturing of the canopy and support columns provided that Carlo Steel assumed toward LB Steel the same "rights" and "redress" that, under the Subcontract, Walsh assumed towards Carlo Steel and, further, that Carlo Steel could withhold payment form LB Steel based on LB Steel's failure to "correct rejected, defective, or nonconforming *** work." Taking these terms together, the Sub-Subcontract permitted Carlo Steel to withhold payment from LB Steel in the event that LB Steel committed a material breach of contract as contemplated by the Subcontract between Carlo Steel and Walsh.

¶ 33    The trial evidence established that, in December 2004, the City discovered cracks in the welding of the canopy and determined that some of those welds were performed by LB Steel. Subsequently, the City withheld payment from Walsh, Walsh withheld payment from Carlo Steel, and Carlo Steel withheld payment from LB Steel. Although the City's investigation did not initially fault LB Steel for the defective welding in the canopy, in November 2005 additional defects were found in LB Steel's welding for the support columns that it had delivered to the project site between December 2003 and March 2004. Those defects encompassed 13 types of welds on each of the 35 columns, some of which had cracks that rendered them "totally ineffective," contained "only a fraction" of the required volume, or failed to connect one part of a column to another. As established at trial, certain of those defects were "critical for the safety of the whole canopy" and prompted a remediation plan that involved temporary shoring around the canopy and the repair or retrofitting of the defective welds.

¶ 34    As noted, the trial court entered judgment in favor of Walsh on its claim for breach of contract by LB Steel. Implicit in the trial court's ruling is the determination that the "defective welds" performed by LB Steel constituted a material breach of the Sub-Subcontract. The evidence established that LB Steel's defective welding caused it to be in material breach of the Sub-Subcontract no later than March 2004, when it delivered the affected support columns, and it remained in material breach when Carlo Steel began withholding payment in December 2004 and when the City discovered defects in LB Steel's welding for the steel support columns it manufactured. It is apparent, therefore, that LB Steel committed the first material breach of contract and, to the extent that Carlo Steel withheld payment, such withholding was contractually permitted and did not constitute a breach on its part. LB Steel, therefore, was not entitled to recover on its claim for breach of contract. See *Dubey v. Public Storage, Inc.*, 395 Ill. App. 3d 342, 361-62 (2009) ("a party who materially breaches a contract cannot take advantage of the terms of the contract which benefit him, nor can he recover damages from the other party to the contract"). Consequently, the trial court's order entering judgment in favor of LB Steel and against Carlo Steel and its indemnitor, Walsh, on LB Steel's claims for breach of contract in count II of its third amended complaint in case number 05 CH 2675 and count I of its counterclaim in case number 07 L 3886 is against the manifest weight of the evidence and, therefore, must be reversed.

¶ 35    In view of the foregoing, we find that the trial court also erred by entering judgment in favor of LB Steel and against Travelers on LB Steel's public construction bond claim raised in count V of LB Steel's third amended complaint in case number 05 CH 2675 and count IV of its counterclaim in case number 07 L 3886. Suit on a public construction bond can be brought if it could be maintained against the principal. *Village of Rosemont v. Lentin Lumber Co.*, 144 Ill. App. 3d 651, 668 (1986). Here, LB Steel could properly raise a claim for breach of contract

against Walsh as Carlo Steel's indemnitor and against Travelers as Walsh's surety. Travelers would be liable to the same degree as Walsh. See *id.* ("As a general rule, the liability of a surety is measured by the liability of its principal."). However, for reasons we have explained, the trial court erred in entering judgment in favor of LB Steel on its claim for breach of contract against Walsh. As such, the judgment in favor of LB Steel and against Travelers on LB Steel's public construction bond claim must also be reversed.

¶ 36 LB Steel argues, however, that even if it breached the Sub-Subcontract, it is still entitled to recover under a theory of substantial performance because the defective welds, in aggregate, constituted only 1000 feet of the 39 miles of total welding.

¶ 37 "Under the doctrine of substantial performance, a contractor may recover where there has been substantial performance of a contract even though there may be some omissions and defects in the contract's performance, as measured by the strict terms of the contract." *National Wrecking Co. v. Midwest Terminal Corp.*, 234 Ill. App. 3d 750, 761 (1992). Substantial performance is the "honest and faithful performance of the contract in its material and substantial parts, with no willful departure from, or omission of, the essential elements of the contract." (Internal quotation marks omitted.) *Doornbos Heating & Air Conditioning, Inc. v. James D. Schlenker, M.D., S.C.*, 403 Ill. App. 3d 468, 483 (2010). Whether a party to a contract rendered substantial performance is a question of fact, and the trial court's determination of that issue will not be disturbed unless it is against the manifest weight of the evidence. *W.E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.*, 115 Ill. 2d 119, 127 (1986).

¶ 38 At the outset, Walsh maintains that the doctrine of substantial performance is inapplicable in the present case because the Sub-Subcontract permitted Carlo Steel to withhold payment to LB Steel "as may be reasonably necessary to protect Carlo Steel from loss or damage caused by" LB Steel's failure to "correct rejected, defective, or nonconforming *** work." We agree. By its plain language, the Sub-Subcontract permitted Carlo Steel to withhold payment, irrespective of whether the work was also substantial. However, for reasons that we have explained, the manifest weight of the evidence showed that LB Steel materially breached the Sub-Subcontract and, as such, failed to render substantial performance under it. See *Mayfair Construction Co.*, 249 Ill. App. 3d at 202-03 (a material breach of contract includes the failure to perform a "substantial undertaking set forth in [the] contract"). As the trial evidence showed, the majority of the welds that were found to be defective did not require remediation, but the welds that required remediation included those that were "critical for the safety of the whole canopy." Because the defective welds constituted a material breach of contract, the fact that they represented just a portion of the total welds that LB Steel performed does not show that LB Steel's breach of contract was unsubstantial. See *Doornbos Heating & Air Conditioning, Inc.* 403 Ill. App. 3d at 483. As such, LB Steel's claim for breach of contract against Carlo Steel and its indemnitor, Walsh, based on substantial performance fails.

¶ 39 LB Steel also contends that it may recover under a theory of *quantum meruit*.[8] When a builder renders less than substantial performance, its measure of recovery under a theory of *quantum meruit* is "reasonable compensation for value received by the [non-breaching party]

---

[8]Walsh argues that LB Steel waived *quantum meruit* as a theory of recovery by raising it for the first time in its reply brief. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) . Because LB Steel's argument responds to an issue that Walsh fixed in its own brief on cross-appeal, LB Steel's reply brief essentially doubled as its response brief, and as such, we will consider its argument on the merits.

- 13 -

over and above the injury suffered by the builder's breach." *Brewer v. Custom Builders Corp.*, 42 Ill. App. 3d 668, 673 (1976). The party seeking recovery has the burden to "introduce some evidence specific enough to prove the reasonable value of the benefit *** allegedly received" by the other party. *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 979 (2010).

¶ 40     In this case, LB Steel introduced no evidence at trial to establish the value that Walsh allegedly received from its partial performance under the Sub-Subcontract. However, the record shows that, before the trial court entered the judgment order, the parties agreed that Walsh and Carlo Steel had retained a total of $4,771,688 due to LB Steel under the Sub-Subcontract following the discovery of cracks in the welding. Counsel for Walsh submitted that, although Walsh was entitled "to withhold that payment under the contract because of the defective work," LB Steel "would be entitled to reduce" the judgment entered against it by that sum if Walsh were to be "made whole." The trial court, as noted, entered judgment in favor of Walsh for $27.5 million on count I of its second amended third-party complaint for breach of contract by LB Steel, and for the reasons we have explained, we have reversed the judgment entered in favor of LB Steel on its breach of contract claim against Walsh and Carlo Steel. It follows that the $4,771,688 which Walsh retained under the Sub-Subcontract constitutes "value received *** over and above the injury" that it sustained due to LB Steel's breach of contract (*Brewer*, 42 Ill. App. 3d at 673); that sum, which is liquidated and admitted by Walsh, constitutes LB Steel's measure of recovery under a theory of *quantum meruit*. Therefore, we reverse the trial court's judgment in favor of Walsh and against LB Steel on LB Steel's claims for *quantum meruit* raised in count III of its third amended complaint in case number 05 CH 2675 and count III of its counterclaim in case number 07 L 3886. Pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we enter judgment in LB Steel's favor against Walsh and Carlo Steel for $4,771,688 on those two counts.

¶ 41     Walsh next argues that the trial court erred by entering judgment in LB Steel's favor on its claim for a lien against public funds raised in count I of its third amended complaint in case number 05 CH 2675 and count II of its counterclaim in case number 07 L 3886, as LB Steel was not entitled to enforce its lien due to its own breach of contract.

¶ 42     The Mechanics Lien Act (770 ILCS 60/0.01 *et seq.* (West 2004)) affords certain protections to contractors who contribute labor or materials to a construction project by allowing them a lien on the subject property. *La Salle Bank National Ass'n v. Cypress Creek 1, LP*, 242 Ill. 2d 231, 237 (2011). Relevant here, the statute provides that subcontractors who render work for a contractor operating under a contract with a government entity "shall have a lien for the value thereof on the money, bonds, or warrants due or to become due the contractor." 770 ILCS 60/23(b) (West 2004). In general, "the contractor must completely perform the contract to enforce its lien for the value of what has been done." *Fieldcrest Builders, Inc.*, 311 Ill. App. 3d at 609. This court has recognized, however, that "[n]otwithstanding the general rule, a contractor still can enforce a mechanic's lien by proving that he substantially performed the contract in a workmanlike manner." *Id.* at 610. For reasons we have explained, the manifest weight of the evidence demonstrated that LB Steel did not substantially perform under the Sub-Subcontract. To the contrary, while the defective welds may have constituted just a portion of the total work performed by LB Steel on the Project, those defects represented significant failures in the performance that was required of it under

- 14 -

the Sub-Subcontract. As such, LB Steel was not entitled to enforce its mechanics lien, and the trial court's order entering judgment in its favor on its mechanics lien claim in count I of its third amended complaint in case number 05 CH 2675 and count II of its counterclaim in case number 07 L 3886 is, therefore, reversed.

¶ 43    Next, we turn to the issue of setoff. As an initial matter we find that, having determined that the trial court erred by entering judgment in favor of LB Steel on its breach of contract, public construction bond, and mechanics lien claims, its orders imposing setoffs based on those judgments must be reversed. Consequently, the only remaining setoff for our consideration involves LB Steel's judgment for the $1,812,696 deposited with the court by Cal Testing. As to that issue, LB Steel contends that the trial court erred by setting off the judgments that were entered in its favor on its claim for breach of contract by Cal Testing against the judgment entered in Walsh's favor, as different parties and *res* were involved in each judgment. We agree.

¶ 44    Section 12-176 of the Code (735 ILCS 5/12-176 (West 2014)) states that "[j]udgments between the same parties may be set off, one against another" pursuant to section 12-177 of the Code. Section 12-177 of the Code (*id.* § 12-177) provides that a judgment in favor of one party may be applied "as far as it will extend, to the satisfaction" of a judgment against that same party "and the balance due on the larger judgment may be collected and paid in the same manner as if there had been no set-off." Thus, taken together, sections 12-176 and 12-177 of the Code direct that "judgments between the same parties may be set off against each other, so that the larger judgment is reduced by the amount of the lesser judgment." *Adam Martin Construction Co. v. The Brandon Partnership*, 135 Ill. App. 3d 324, 327 (1985). Under Illinois law, "[t]he burden of proving an enforceable right of setoff rests with the party asserting the right" (*In re Clark Retail Enterprises, Inc.*, 308 B.R. 869, 895 (Bankr. N.D. Ill. 2004)), and the amount of the setoff must be certain and ascertainable (*Bank of Chicago-Garfield Ridge v. Park National Bank*, 237 Ill. App. 3d 1085, 1091 (1992)).

¶ 45    Pursuant to section 12-178 of the Code (735 ILCS 5/12-178 (West 2014)), setoff is not available when (1) "the creditor in one of the judgments is not in the same capacity and trust as the debtor in the other"; (2) "the sum due on the first judgment was lawfully and in good faith assigned to another person, before the creditor in the second judgment became entitled to the sum due thereon"; (3) "there are several creditors in one judgment, and the sum due on the other is due from a part of them only"; or (4) "there are several debtors in one judgment, and the sum due on the other is due to a part of them only." Additionally, setoff is unavailable for that portion of a judgment "due to the attorney in that action for his or her fees and disbursements therein." *Id.* § 12-178(5).

¶ 46    Applying these principles in the present case, we find that the trial court erred in setting off LB Steel's judgment for the funds deposited by Cal Testing against the judgment entered in Walsh's favor. In contravention of section 12-178(1) of the Code, there was no mutuality as to the parties involved in the judgments at issue. *Id.* § 12-178(1); see also *Brown v. Farkas*, 158 Ill. App. 3d 772, 780-81 (1986) (denying setoff due to lack of mutuality between the parties to the judgments). The trial court's order setting off LB Steel's judgment for breach of contract against Cal Testing is, therefore, reversed, as is its order releasing to Walsh the sum deposited by Cal Testing.

¶ 47    Because we find that each of the setoffs imposed by the trial court must be reversed, we need not reach LB Steel's additional contention that setoff was improper due to the notice of

attorney's lien filed by its trial counsel, Conway & Mrowiec, and the lien alleged by MB Financial. However, as we have entered judgment in favor of LB Steel and against Carlo Steel and Walsh on LB Steel's *quantum meruit* claims, we remand the cause to the trial court for a hearing on whether or to what extent the judgment in favor of LB Steel on its *quantum meruit* claims should be offset against the judgment in favor of Walsh on its breach of contract claim. In so holding, we express no opinion on the merits of this issue.

¶ 48       LB Steel next contends that the trial court erred in failing to reduce Walsh's judgment by the $8 million it received under the Zurich policy. The following background is relevant for understanding the arguments that LB Steel raises in support of its assignment of error.

¶ 49       The Zurich policy states that it covers claims arising from (1) "an actual or alleged negligent act, error or omission with respect to the rendering of or failure to render 'Professional Services' by [Walsh] or any entity for which [Walsh] is legally responsible" or (2) "a negligent act, error or omission of the 'Design Professional' in the rendering of or failure to render 'Professional Services.' " Professional services are defined as services that Walsh or a design professional is "qualified to perform for others in their capacity as an architect, engineer, landscape architect, land surveyor or planner, construction manager, [or] LEED accredited professional, interior designer/space planner, or as specifically described by endorsement to this policy." A design professional, in turn, is defined as a person or entity "professionally qualified to perform 'Professional Services' either itself or through the services of a subcontractor or subconsultant at any tier." The Zurich policy excludes "the cost to repair or replace faulty workmanship in any construction[ ] *** or manufacturing process performed or provided by [Walsh] or anyone for whom [Walsh] is legally responsible." The Zurich policy also excludes "materials" and "workmanship which is not in accordance with the drawings and specifications with respect to any construction, *** or manufacturing process."

¶ 50       At trial, Walsh proffered the testimony of one of its senior managers, Dan Wierec, who testified that Walsh's claim under the Zurich policy was premised on design errors by the City's architects and that no portion of the insurance payment related to defective steel fabrication. Wierec testified in reference to Walsh's "Job Cost Report," which it tendered to LB Steel after the close of discovery. The Job Cost Report is a document summarizing Walsh's financial involvement in the Project. The section of the Job Cost Report related to LB Steel's work includes a line item for the $8 million payment under the Zurich policy.

¶ 51       Following Wierec's testimony, the trial court reopened discovery to permit the discovery depositions of Walsh Vice President of Risk Management Patrick O'Connor and a Zurich employee, Michael Parsons. O'Connor testified that the Zurich policy does not cover errors or omissions by the architecture firm that designed the Project "[t]o the extent that they work for" the City. Parsons testified that the $8 million payment from Zurich to Walsh was for "[s]ettlement of any and all issues between Walsh and Zurich on the claim," with "no allocation." Neither O'Connor nor Parsons testified at trial, nor does the record show that their discovery depositions were entered into evidence; however, LB Steel attached excerpts from both depositions to a brief it filed in the trial court, wherein it argued that Wierec's testimony "should be barred" because it was contradicted by O'Connor's and Parson's statements.

¶ 52       Based on the foregoing, LB Steel contends that the trial court's failure to reduce Walsh's judgment by the $8 million insurance payment constituted "a misconstruction of the plain terms" of the Zurich policy, which, according to LB Steel, establish that the insurance payment was for damages attributed to it by Walsh. Additionally, LB Steel contends that the trial court

made "an erroneous finding of fact" where the Job Cost Report proved that Walsh "credit[ed] LB Steel" with the Zurich policy payment.

¶ 53    Initially, we reject the notion that the proper interpretation of the Zurich policy turns on what inferences, if any, may be derived from the Job Cost Report. The construction of contracts, including insurance policies, presents questions of law rather than factual determinations; our review is, therefore, *de novo*. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010). In construing an insurance policy, our primary objective "is to ascertain and give effect to the intentions of the parties as expressed by the language of the policy." *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 362 (2006). In doing so, we interpret the policy as a whole and, if possible, give effect to every provision. *Id.* A court may consider extrinsic material "only where the policy's language is ambiguous," and if the language is unambiguous, the policy generally "will be applied as written." *Sharp v. Trans Union L.L.C.*, 364 Ill. App. 3d 64, 71-72 (2006).

¶ 54    Applying these principles in the present case, we observe that the Zurich policy, by its plain language, covers claims arising out of negligent acts, errors, or omissions of design professionals for whom Walsh is legally responsible. Also by its plain language, the Zurich policy excludes coverage for claims involving faulty or noncompliant workmanship in "construction," "manufacturing," or "materials." Nothing in the record suggests that LB Steel is a design professional for purposes of the Zurich policy. To the contrary, LB Steel was a steel fabricator that manufactured steel supports for use in the Project. The claims arising from LB Steel's defective welding related to construction, manufacturing, and materials. Based on the relevant provisions of the Zurich policy, these claims were expressly excluded from coverage.

¶ 55    LB Steel argues, however, that evidence adduced at trial established that it retained R.I. Johnson, a design professional, to "provide calculations for the redesigned welds" as the Project progressed and that the Zurich policy extends coverage for the errors or omissions of design professionals working for LB Steel. This assertion is unsupported by the terms of the Zurich policy, which, contrary to LB Steel's assertion, does not "provide*** coverage" for any and all entities "working for Walsh or one of Walsh's subcontractors." Rather, the policy covers negligent acts, errors, and omissions by design professionals retained by Walsh or an entity for which Walsh "is legally responsible." LB Steel has made no showing that Walsh was legally responsible for the work of a design professional retained by LB Steel. Therefore, we find that the trial court did not err in failing to reduce Walsh's judgment by the $8 million it received under the Zurich policy.

¶ 56    To the extent LB Steel contends that the trial court erred by refusing to bar Wierec's testimony, we find that the issue has been forfeited. Although LB Steel alleges that it was "prejudic[ed]" by Walsh's late disclosure of the Job Cost Report, it neither develops this contention nor supports it with citations to authority. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017); *Ramos v. Kewanee Hospital*, 2013 IL App (3d) 120001, ¶ 37 ("failure to properly develop an argument and support it with citation to relevant authority results in forfeiture of that argument").

¶ 57    LB Steel also argues that the $27.5 million judgment entered in favor of Walsh must be reduced by whatever payment Walsh is entitled to receive under its insurance policy with St. Paul (St. Paul policy). As of the filing of this opinion, the St. Paul policy is the subject of litigation in the United States District Court for the Northern District of Illinois, Eastern Division (case number 15 CV 10324), which has been stayed pending resolution of the present

appeal. LB Steel has identified nothing in the record showing that the St. Paul policy was before the trial court nor identified a copy of the St. Paul policy in the record on appeal. The issue is, therefore, forfeited. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (an appellant must produce a sufficiently complete record to support a claim of error; any doubts arising from the record's inadequacy are resolved against the appellant).

¶ 58     As a final matter, we observe that, although LB Steel's trial brief stated that it proceeded on, *inter alia*, its claim for unjust enrichment against Carlo Steel and Walsh raised in count VI of its third amended complaint in case number 05 CH 2675 and count V of its counterclaim in case number 07 L 3886, the trial court ruled upon the former count but not the latter. It appears, therefore, that count V of LB Steel's counterclaim in case 07 L 3886 is still pending before the trial court.

¶ 59     In summary, (1) the judgment entered in favor of Walsh and against LB Steel for $27.5 million on count I for breach of contract from Walsh's second amended third-party complaint is affirmed; (2) the judgment entered in favor of LB Steel and against Walsh on count IV for fraud from Walsh's second amended third-party complaint is affirmed; (3) the $6.5 million judgment entered in favor of LB Steel and against Carlo Steel and Walsh on LB Steel's claim for breach of contract raised in count II of its third amended complaint and count I of its counterclaim is reversed; (4) the $6.5 million judgment entered in favor of LB Steel and the City for the use and benefit of LB Steel and against Travelers on LB Steel's public construction bond claim raised in count V of its third amended complaint and count IV of its counterclaim is reversed; (5) the $1,554,654 judgment entered in favor of LB Steel and against Walsh on LB Steel's claim for a lien against public funds raised in count I of its third amended complaint and count II of its counterclaim is reversed; (6) the judgment entered in favor of LB Steel for the $1,812,696 deposited with the clerk of the circuit court by Cal Testing, raised in count VI of LB Steel's counterclaim, its counterclaim for the interpleaded funds, and its second amended complaint against Cal Testing, is affirmed; (7) the trial court's order releasing the $1,812,696 to Walsh is reversed; (8) the judgment entered in favor of Walsh and against LB Steel on LB Steel's claim for *quantum meruit* raised in count III of its third amended complaint and count III of its counterclaim is reversed, and judgment is entered in favor of LB Steel and against Walsh and Carlo Steel for $4,771,688 on those counts; (9) the judgment entered in favor of Walsh and Carlo Steel and against LB Steel on LB Steel's claim for unjust enrichment raised in count VI of its third amended complaint is affirmed; and (10) each setoff imposed by the trial court is reversed. Carlo Steel's appeal is dismissed for lack of jurisdiction, and the cause is remanded for further proceedings.

¶ 60     Dismissed in part, affirmed in part, reversed in part, judgment entered, and remanded.