NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 240742-U

NO. 4-24-0742

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 27, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.W., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
| Petitioner-Appellee, | ) | No. 20JA75 |
| v. | ) | |
| Jessica M., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's findings that respondent was unfit and that termination of the parental relationship was in the best interest of her child were not against the manifest weight of the evidence.

¶ 2    Respondent Jessica M. is the mother of S.W., a minor (born in 2017). In September 2020, the State filed a petition for adjudication of wardship of S.W., who was subsequently adjudicated to be neglected and made a ward of the court. In January 2023, the State filed a petition for termination of parental rights, and in February 2024, the trial court concluded that respondent and S.W.'s father were unfit parents. Following a best-interest hearing held in February and April 2024, the court found it was in S.W.'s best interest that respondent's parental rights be terminated.

¶ 3    Respondent appeals, claiming the trial court's findings were against the manifest weight of the evidence.

¶ 4 We affirm.

¶ 5 I. BACKGROUND

¶ 6 A. Initial Filing

¶ 7 A petition for adjudication of wardship of S.W. was filed on September 2, 2020, naming his parents, respondent (mother) and Kelvin W. (father). The petition alleged neglect and abuse arising out of an August 26, 2020, incident in which S.W. was dropped off at daycare with unexplained bruising.

¶ 8 B. Adjudicatory and Dispositional Orders

¶ 9 In an adjudicatory order entered on March 23, 2021, the trial court made S.W. a ward of the court. In a dispositional order entered on May 4, 2021, the court found S.W. had been neglected. (Although the order in the record on appeal has the grounds redacted, we note the April 5, 2024, termination hearing order clearly states that S.W. had been found neglected on May 5, 2021.).

¶ 10 C. Motion for Termination of Parental Rights

¶ 11 On January 25, 2023, the State filed a motion for termination of parental rights as to S.W. and alleged that both parents were unfit; the father is not a party to this appeal. The motion asserted that respondent was an unfit parent under section 1(D)(m)(i), (ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2022)) because she (1) failed to make reasonable efforts to correct the conditions which were the basis for the removal of S.W., (2) failed to make reasonable progress toward the return of S.W. within any nine-month time period after an adjudication of neglect, and (3) failed to make reasonable progress toward S.W.'s return in any nine-month period after the end of the initial nine-month period following the adjudication of neglect. The petition further contended that it was in the best interest of S.W. that respondent's parental rights be terminated

and that the Illinois Department of Children and Family Services be authorized to consent to S.W.'s adoption.

¶ 12                                    D. Fitness Hearing

¶ 13        The initial hearing on termination of parental rights was held on February 22, 2024, at which time five witnesses testified, including respondent.

¶ 14                                    1. *Emily Gregory*

¶ 15        Emily Gregory is a visitation specialist with Chaddock Foster and Adoption (Chaddock) and served as such for S.W. from June 2022 to June 2023. She testified that at the beginning of that period, respondent had visitation with S.W. "twice a week," on Thursdays and Fridays. "And then about mid-2023, I believe, she got down to one visit a week which would have been [] on Friday." Gregory said there were a couple of issues with respondent not showing up for her visits, some of which were due to sickness. She said at least two visits were to be conducted remotely, but respondent did not show up. Some visits were terminated early because respondent said she needed to go to church. Although Gregory had no evidence that respondent had not been sick during the missed visits, she also had no knowledge of respondent providing documentation of illness as required. Gregory said that respondent made up the missed visits.

¶ 16        Gregory said she did not observe any visits where respondent in any way abused S.W. She said respondent "provided him meals and interacted with him" and that the two sometimes played board games. She said that S.W. "would occasionally give [respondent] hugs and kisses when [he] would be leaving or showing up" from a visitation. She testified she did see S.W. throw a fit on one occasion, explaining:

> "There was one time I went to pick him up from school and it took about an hour-and-a-half to get him out of the building. He just totally refused to go to visits.

There [were] some other times that he would refuse or he would tell me he didn't want to go and see mom but then we would get there and some of it, he would be fine, and then other times he just totally [did] not want to interact."

¶ 17          She was also asked whether there were times when S.W. "didn't want to end the visits when it was time to go," to which Gregory answered: "He would say that he didn't want to leave and say that he wanted to stay but he would still leave. He would only cry for probably two minutes until we drove away and then he would stop crying."

¶ 18                              2. *Kelsey Platt*

¶ 19          Kelsey Platt, the former supervisor of foster and adoption at Chaddock, testified that it was her duty as supervisor to approve service plans for families being serviced by Chaddock; she supervised caseworkers Brett Landwehr and Megan McCoy. She discussed the service plans dated July 21, 2021, and August 10, 2022. According to Platt, "[t]he [July 21] service plan covers the six months prior to the date that is on the service plan so it would have been from six months prior to July to current." She noted some of the goals that were listed for respondent, including "housing, cooperation, domestic violence, mental health services [and] her services and stability." Platt saw that respondent "was engaged in services but they were not satisfactory [*sic*] complete at that time." She explained that respondent's progress was not satisfactory in the area of domestic violence for the following reasons:

> "She was engaged in the Eve Project. However, there were concerns reported by her domestic violence provider that she was not making progresses in the area of— in the areas of like acknowledging or taking accountability for actions as well as she would miss appointments. I believe the terminology that the provider used was that she would let her physical health interfere with her services."

- 4 -

¶ 20　　　　　Respondent's progress was rated satisfactory in the areas of housing, employment, and parenting. Platt said respondent missed a total of nine visits with S.W. during that service plan period, three of which were excused.

¶ 21　　　　　Concerning the August 10, 2022, service plan, Platt said that respondent was rated as satisfactory overall but that "domestic violence and mental health were still rated unsatisfactory." Concerning respondent's housing, she said respondent was rated unsatisfactory because "she had moved out of her own apartment and lived with her mother at that time and she had reported it wasn't a great situation for her." There was also a period of 30 days where respondent was in jail. Platt explained, "She had, when the case opened, she was on probation for a domestic violence charge. She got another charge during the case, as well, and so that was revoked. Her probation was revoked and she had to do 30 days in jail." Respondent did not exercise visitation while she was incarcerated but resumed visits upon her release. None of respondent's visits were unsupervised.

¶ 22　　　　　Platt said that respondent had reenrolled in parenting classes through Hobby Horse during early 2021 and eventually completed them in April of that year. She said that the Hobby Horse classes involved parenting education and were not a substitute for Eve's Project, which focused on domestic violence. Platt testified further that respondent "did complete the Eve's Project and they reported satisfactory. However, we had discussions with [respondent] and we had concerns regarding their guarded—their guarded observations of the class." Platt explained, "We requested that she start another, whether it be Eve Project or different domestic violence provider to start another one due to the guarded concerns and the guarded last report." Platt said that respondent completed the course a second time at some point after the reporting period for the July 2023 service plan.

¶ 23                                3. *Brett Landwehr*

¶ 24          Brett Landwehr worked for Chaddock as a child welfare specialist and was the caseworker when the January 25, 2022, service plan was created. He said that respondent rated unsatisfactory in the subtask of cooperation because of her pending prior domestic violence case and unsatisfactory in housing, employment, and mental health. However, her overall rating for the January 2022 report was satisfactory. He explained respondent's unsatisfactory rating in the area of mental health was based on a report from the counselor from Eve's Project, who said that respondent was still "not taking accountability and [was] blaming physical ailments." He also said that some of the subtasks carried more weight than others and that it was still possible for a parent to be unsatisfactory on one or two subtasks but still be satisfactory overall.

¶ 25                                4. *Megan McCoy*

¶ 26          Megan McCoy had served as a welfare specialist at Chaddock since June 2022 and became the assigned caseworker for S.W. in September 2022. She testified concerning the January 17, 2023, service plan, which covered August 2022 through the date of the plan. Respondent's goals remained the same, and she rated satisfactory in cooperation, housing and employment, and mental health, but her parenting was rated unsatisfactory. McCoy said that

> "[respondent] had missed several visits. There were a couple visits that she canceled or that she left 30 minutes early to go to church. She left one an hour early to go to church. There were a couple that she missed due to sickness but did not provide documentation. The visits were just really inconsistent."

McCoy believed that respondent provided documentation for a couple of the missed visits, but not all of them.

¶ 27    Concerning the subcategories of parenting and domestic violence, respondent was rated unsatisfactory. Regarding the latter, McCoy explained that, "At that point in time, we had asked her to reengage in classes through the Eve Project, not retake the entire class but just engage in follow-up classes to provide support and accountability and she had only engaged in a couple at that point."

¶ 28    McCoy stated that respondent had rated unsatisfactory in the July 25, 2023, service plan subtask of cooperation because "[t]here was a domestic violence incident in her home during that reporting period and she did not inform me of the domestic violence incident." The incident, which involved respondent and her then-boyfriend, occurred in the presence of the boyfriend's son and resulted in a domestic hotline call. McCoy said respondent's housing was also rated unsatisfactory because her boyfriend was found to be living in the home, something which respondent had not reported. She also rated unsatisfactory in mental health because she had missed 9 of 16 therapy sessions.

¶ 29    McCoy testified that respondent's visitation in 2022 became more inconsistent; after March of that year, her visits were reduced in length from two hours, twice a week, to a single two-hour weekly visit. In April, visitation was reduced to every other week.

¶ 30                5. *Respondent*

¶ 31    Respondent testified about visitation with her son, during which the two often played games and respondent would bring dinner. Respondent acknowledged that some of her visits ended early due to her church schedule and that she missed other visits due to illnesses; some of the missed visits were made up. Respondent said that she had stopped attending some of the Eve's Project sessions because of an issue with the male instructor. She acknowledged that she had lived with her mother for a time due to financial issues and attended only 9 of 15 domestic

violence sessions. She also acknowledged there was a domestic violence incident involving her new boyfriend in 2023 that took place in her home. She believed she had made progress during the period from March 2022 through July 2023.

¶ 32 The trial court admitted the service plan reports dated July 21, 2021, January 25, 2022, August 10, 2022, January 17, 2023, and July 25, 2023, into evidence as Peoples' exhibits 1 through 5, respectively.

¶ 33       6. *Fitness Finding*

¶ 34 At the conclusion of the hearing, the trial court orally found that respondent was unfit. According to the court, the service plans, although "an appropriate item of evidence for the Court to considerate [*sic*] at these hearings," were not dispositive. Rather, "[t]he Court is required to look at all the evidence in the case to determine the fitness of the parents in relation to the needs of the minor." The court observed:

> "It is clear and I don't think anybody disagrees with the fact that the date of adjudication in this case was in March of 2021, just about three years ago. And the evidence with regard to unfitness that has been presented is largely not in dispute in this case based on the exhibits and the testimony. We know from all that that both of the parents at different times following the date of adjudication and during the specific nine-month periods of time alleged that both parents were involved in some services during those times and at different times during those time periods, also the parents did make some degree of progress with some of those services. There were visits occurring between the minor and the parents, both parents. Those visits were always supervised by the Department or the agency. *** And all that was in the evidence today and is largely not in dispute.

The evidence was also *** undisputed that during each of the three month, three nine-month periods of time while the supervised visits were going on, that there never did come a time when the agency was able to make any kind of a recommendation that the visits for either parent could be unsupervised, [and] never a recommendation made that the minor be placed back into the custody of either of the parents. There were no recommendations ever made that the minor should have extended visits overnight or otherwise with either of the parents. The visits were always just supervised and that's as far as it went."

¶ 35    The trial court continued:

"With regard to the mother, the allegations of unfitness as to her are that she failed to make reasonable efforts to correct conditions which were the basis for removal, failed to make reasonable progress toward the return of the minor within any nine-month period of time after adjudication. Court is going to find that those allegations have also been proven by clear and convincing evidence. The bottom line is throughout all the evidence in this case that the mother was involved in some services, has been involved in some services since the adjudication in March of 2021 and has been having supervised visits but there were many times when efforts do not always translate into the type of progress that's contemplated by the statute and that appears to be the case here. There were efforts made but it never translated into the type of substantial progress that would be necessary to consider having the minor placed back into the custody of the mother. So the Court is going to make those findings today with regard to the issue of unfitness as to each of the parents."

A written order memorializing the court's oral rulings was entered the same day.

¶ 36                                    E. Best-Interest Hearing

¶ 37            A best-interest hearing was held on April 5, 2024, at which McCoy testified that

S.W. was six years old and currently residing with his maternal grandparents and half-brother.

McCoy said S.W. appeared to be well adjusted in his placement and appears to be bonded to his

foster parents and sibling. McCoy said that S.W. "look to [the foster parents] to have his needs

met" and that he was "always giving them hugs, kisses," and he "shows affection to them." S.W.

referred to the foster parents as "mom" and "papa."

¶ 38            McCoy testified that the foster parents had ensured S.W. receives a proper

education and that he made it to school or extracurricular events as needed. The foster parents were

aware of S.W.'s behavioral issues and had obtained assistance from his school, and the behavioral

issues had declined. McCoy explained that S.W.'s behavioral issues "were worse around visit days,

which were Thursdays and Fridays." McCoy testified that the foster parents were willing to adopt

S.W. and there were no issues at Chaddock with the child being adopted by the foster family.

¶ 39            Following McCoy's testimony, respondent moved to have the trial court take

judicial notice of "the previous evidence as well as the exhibits received by the court." No

objection was made, and the court granted the motion.

¶ 40            At the conclusion of the evidence and argument, the trial court determined it was

in S.W.'s best interest that respondent's parental rights be terminated. In rendering its oral ruling,

the court noted that S.W. was currently six years of age and was "currently in a relative foster

placement" and "has been in that placement for in excess of two years." According to the court:

            "There have been some other placements prior to that, but this most recent one has

            been in place for over two years, has been the only home the minor has known for

those past two years. The minor appears to be well adjusted to the home, bonded to the foster parents and to the half sibling who also resides in that residence.

\* \* \*

The evidence has shown that all the minor's needs are being met in the foster placement including any educational and [Individual Education Plan (IEP)] needs. The home appears to be safe and appropriate. It is considered a pre-adoptive placement due to the commitments which have been made by the foster parents."

¶ 41    The trial court further stated:

"[T]here's no doubt that as far as the mother is concerned that there's love between the mother and the minor. We don't know exactly what their relationship is at this point. There hasn't been a lot of evidence, if any, presented to show when, if ever, it could be possible to consider placing the minor back into the custody of either of the natural parents. There's been no recommendation made for that at any point including today."

¶ 42    Moreover, the trial court considered the numerous statutory factors applicable to the best interest of a minor regarding placement and/or termination and stated as follows:

"The court's been able to consider those factors in evaluating these issues here today. We do know that the Juvenile Court Act [of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022))], which is what we're operating under in these cases, does require that the court make every effort to achieve permanency for a minor as soon as that can be done for each minor involved. The statute even sets up a timeline of going to a point nine months after a date of adjudication that the court can begin considering whether or not parents have been making

- 11 -

satisfactory progress toward any type of a return home goal. In this case we've gone way beyond that time period of the nine months. We're out over three years now trying to get things to make a determination if there was going to be a return home goal possible."

¶ 43    The trial court concluded that "the best opportunity for this minor to achieve permanency as required by the Juvenile Court Act is to be able to follow the plan which is currently in place through the agency, to be adopted by the current foster parents." Accordingly, the court found that the State satisfied its burden of showing it was in "the best interest of this minor to have the rights of the natural parents be terminated, that the goal of this case will be changed to that of adoption." A written order memorializing the court's findings was entered the same day.

¶ 44    This appeal followed.

¶ 45                              II. ANALYSIS

¶ 46    On appeal, respondent challenges the trial court's fitness and best-interest findings, claiming they were against the manifest weight of the evidence.

¶ 47                              A. Judicial Notice

¶ 48    At the outset, we note that respondent's statement of issues listed a challenge to the trial court's decision to take judicial notice of the entire previous file in her case. However, respondent did not raise this point as an issue within her brief, nor did she make any arguments in support of that point. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) provides that "[p]oints not argued are forfeited" and the "failure to properly develop an argument and support it with citation to relevant authority results in forfeiture of that argument." *Ramos v. Kewanee Hospital*, 2013 IL App (3d) 120001, ¶ 37. Accordingly, we decline to review that issue.

¶ 49                              B. Unfitness Finding

¶ 50        At the fitness portion of the hearing on the termination of parental rights, it is the State's obligation to prove by clear and convincing evidence that the parent is "unfit" under one or more of the grounds provided by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022); 705 ILCS 405/2-29(2), (4) (West 2022)). *In re Al. P.*, 2017 IL App (4th) 170435, ¶ 40. In reviewing the trial court's decision, we do not retry the case; instead, we are limited to deciding whether the trial court's finding of unfitness is against the manifest weight of the evidence. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. A decision is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33.

¶ 51        The trial court found that respondent was unfit under the applicable statute in that she failed to make reasonable progress toward return of the child to the home during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2022)). "Reasonable progress" is an objective standard; it means that a parent has made progress by complying with directives given for the return of the child such that the court will be able to return the child to parental custody in the near future. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88.

¶ 52        Here, the trial court acknowledged the importance of comparing respondent's efforts against the various service plans, but it also looked to the entirety of the evidence at the hearing and determined that the State had met its burden in establishing unfitness. The court found it significant that although supervised visits were occurring, "there never did come a time when the agency was able to make any kind of a recommendation that the visits for either parent could be unsupervised, never a recommendation made that the minor be placed back into the custody of either of the parents." Similarly, "[t]here were no recommendations ever made that the minor should have extended visits overnight or otherwise with either of the parents."

¶ 53    The trial court also found it significant that respondent had not made sufficient progress in relation to her goals and her service plans. Here, we note that the trial court's findings were based on its review of the evidence, which included hearing the testimony of five witnesses. We note that this court attributes great deference to a trial court's fitness findings " 'because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility.' " *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004)). We find nothing to indicate that the trial court's findings and conclusions as to respondent's unfitness were against the manifest weight of the evidence.

¶ 54                          C. Best-Interest Determination

¶ 55    Following a finding of unfitness, the focus shifts to the child. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated. *Id.* Accordingly, at a best-interest hearing, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.*

¶ 56    The determination of whether termination of parental rights serves a minor's best interest relies on the consideration of several factors, including:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the

- 14 -

risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006). See also 705 ILCS 405/1-3(4.05)(a)-(j) (West 2022). "The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 57　　　　The State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the minor's best interest. *D.T.*, 212 Ill. 2d at 366. "A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility." *J.B.*, 2019 IL App (4th) 190537, ¶ 33. Consequently, we will not reverse a trial court's best-interest finding and termination of parental rights unless its decision is against the manifest weight of the evidence. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 68.

¶ 58　　　　Again, we note that the trial court considered all the evidence at the hearing and determined that the State had met its burden. According to the court, "The minor appears to be well adjusted to the home, bonded to the foster parents and to the half sibling who also resides in that residence." It further stated, "The evidence has shown that all the minor's needs are being met in the foster placement including any educational and IEP needs." We further note that the foster parents had implemented age-appropriate disciplinary action to address S.W.'s behavioral problems, which had decreased. Moreover, they expressed a desire to adopt S.W. and have already executed the necessary paperwork. Finally, there was no evidence presented at the hearing establishing that respondent was able to provide S.W. with the basic necessities that were already being provided by the foster parents. Thus, there is no evidence showing that continuation of

respondent's parental rights would improve S.W.'s future, "including his financial, social, and emotional well-being." *In re L.B.*, 2015 IL App (3d) 150023, ¶ 14.

¶ 59 A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result. *J.B.*, 2019 IL App (4th) 190537, ¶ 33. Here, we conclude that the trial court's finding that it was in S.W.'s best interest to terminate respondent's parental rights is not against the manifest weight of the evidence.

¶ 60                                    III. CONCLUSION

¶ 61         For the reasons stated, we affirm the trial court's judgment.

¶ 62         Affirmed.